Corey Sharod FREEMAN, Appellant,

v.

STATE of Texas, Appellee.

No. 11–05–00254–CR.

Court of Appeals of Texas,
Eastland.

May 24, 2007.

William D. Cox, III, Dallas, for appellant.

Craig Watkins, Dist. Atty., Anne Wetherholt, Asst. Dist. Atty., Dallas, for appellee.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE, J.

**OPINION**

RICK STRANGE, Justice.

The jury convicted Corey Sharod Freeman of murder and assessed his punishment at fifteen years confinement and a $5,000 fine. We affirm.

### I. *Background Facts*

In the early morning hours of February 16, 2002, Steve Fields (Red) was fatally shot three times at the Aspen Chase apartment complex. During the ensuing investigation, the police received a call from Red's common-law wife. She gave them Priscilla Brewer's name and phone number. Detective Randy Edward Loboda contacted Brewer and arranged a meeting. He showed her six pictures, including a picture of Freeman. Brewer was unable to identify the shooter, but she did provide a written statement implicating Freeman. She indicated that Freeman shot Red in retribution for stealing crack cocaine from his apartment.

Detective Lauran Elterman subsequently interviewed Schawana Johnson. She too provided a written statement implicating Freeman. Johnson and Freeman were living together. She stated that someone broke into their apartment and stole Freeman's crack cocaine. Freeman believed Red was responsible and threatened to beat him. The night of the shooting, Freeman came into their apartment, woke her, and took her to a park. There, he told her that he had gotten into an altercation with Red and started shooting.

Detective Elterman also obtained a statement from Bridget Daniels. Daniels saw Freeman driving through the complex two days before the shooting. He stopped and asked her if she had seen Red. Freeman told her that Red had kicked in his door and stolen $80 worth of drugs and that he intended to "[k]ick his ass." After the shooting, Freeman called her and asked what was being said in the complex about the shooting. She told him that people believed he had killed Red. He responded that "[i]t wasn't supposed to go

down like that." Freeman was arrested and was indicted for murder.

## II. *Issues*

Freeman challenges his conviction with nineteen issues. These can be grouped into seven areas:

- the composition of the venire panel;
- rulings made by the trial court in response to Brewer's testimony;
- other evidentiary rulings made during trial;
- the trial court's admonitions to Freeman when his trial counsel indicated an intention to not put on a defense following an adverse ruling;
- the trial court's failure to sua sponte grant a mistrial in response to actions taken by the State;
- requests for lesser included offenses in the charge; and
- factual sufficiency challenges.

## III. *Analysis*

### A. *The Composition of the Jury Panel.*

■ Freeman objected to the jury panel because only seven of seventy-two potential jurors were African–American. Freeman contended that African–Americans constituted approximately 45% to 48% of Dallas County's population and, therefore, that it would be impossible to pick a constitutionally sufficient jury from this panel.[1] The trial court denied Freeman's motion to quash the panel noting that it had been randomly selected and that the clerk of the Central Jury Room did not know the defendant's race when a jury was ordered.

---

1. The State does not concede the accuracy of Freeman's statement, contending that, as of the 2000 census, African–Americans comprised 20.31% of Dallas County's population.

■ The Constitution does not require proportionate representation of races on jury panels, but it does require that panels be selected without discrimination as to race. *May v. State*, 738 S.W.2d 261, 269 (Tex.Crim.App.1987). A constitutional violation exists when the under-representation of a distinctive group in the community results from systematic exclusion of that group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). This requires proof of more than disproportionate representation in a single panel. *May*, 738 S.W.2d at 269.

Freeman argues that the under-representation of African–Americans necessarily resulted from systematic exclusion because the record contains no evidence of a random selection process. The record contains few details concerning Dallas County's jury selection process, but because Freeman had the burden of proof, this silence weighs against rather than for his position. Because Freeman offered no evidence beyond his attorney's description of Dallas County demographics, the trial court did not err when it denied his motion to quash. Freeman's fifteenth issue is overruled.

### B. *The Trial Court's Rulings in Response to Priscilla Brewer's Testimony.*

Freeman's counsel advised the trial court prior to the start of testimony that he believed the State would attempt to offer inadmissible hearsay evidence. The State responded that it intended to offer evidence through Brewer that fell within the present-sense-impression exception. The trial court then conducted a hearing to determine the admissibility of Brewer's expected testimony. Brewer testified that,

---

*See* http://en.wikipedia.org/wiki/Dallas—County,—Texas# Demographics. It is unnecessary for us to resolve this issue.

in February 2002, she lived in the Aspen Chase Apartments and that, on the morning of February 16, 2002, she witnessed a shooting. Brewer and an individual named Miquel were riding in her car. They heard gunfire and looked up. Miquel said, "That's Corey." Brewer asked, "[I]s it?" Miquel responded, "[Y]es."

Freeman lodged several objections to this testimony and asked for a continuance to try to locate Miquel. The trial court overruled Freeman's objections and allowed Brewer to testify about Miquel's statements. Freeman asserts four issues related to the admission of this testimony.

*1. Did the Court Err by not Granting a Continuance?*

■ Freeman asserts first that the trial court erred by not granting his oral motion for continuance. Freeman's issue has not been preserved because he did not file a written, sworn motion for continuance. *See* Tex.Code Crim. Proc. Ann. arts. 29.03, 29.08 (Vernon 2006); *see also Dewberry v. State,* 4 S.W.3d 735, 755 (Tex.Crim.App. 1999). Freeman's first issue is overruled.[2]

*2. Did the Trial Court Err by not Granting Freeman's Motion for Mistrial?*

■ When the State rested, Freeman asked for a mistrial contending that the State concealed *Brady* material by not revealing that Brewer was recanting her statement.[3] The State responded that

Brewer did not recant but provided additional detail. The trial court was already aware that Freeman's counsel had spoken to Brewer before trial[4] and had previously noted that the State tendered more discovery material before trial than was required or requested.[5] Following counsel's argument, the trial court reconfirmed that Freeman's counsel had interviewed Brewer and then held that her testimony did not constitute *Brady* material.

■ The denial of a motion for mistrial is reviewed for an abuse of discretion. *Ladd v. State,* 3 S.W.3d 547, 567 (Tex. Crim.App.1999). We analyze the alleged *Brady* violation in light of all the other evidence adduced at trial. *Hampton v. State,* 86 S.W.3d 603, 612–13 (Tex.Crim. App.2002).

■ The State has an affirmative duty to disclose exculpatory evidence that is material either to guilt or punishment. *Brady,* 373 U.S. at 86, 83 S.Ct. 1194. The State's duty to reveal *Brady* material attaches when the information comes into its possession, not when it is requested.[6] *Thomas v. State,* 841 S.W.2d 399, 407 (Tex. Crim.App.1992). To establish reversible error, a defendant must show that (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, i.e.,

---

2. Even if the issue were before us, the record does not indicate that the trial court abused its discretion. The trial court noted that counsel had interviewed Brewer before trial and that she had been accessible to him for some time. The court indicated that counsel had been afforded the opportunity to learn about Miquel and that his name should not have come as a surprise. We cannot say based upon the record that these conclusions constitute an abuse of discretion.

3. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

4. This was developed during the hearing on Freeman's motion for continuance.

5. Pursuant to Tex.R. Evid. 615, the State was not required to provide Freeman with Brewer's statement until after her testimony on direct.

6. Freeman did not submit any written discovery requests, but he did receive seventy-two pages of material from the district attorney's office pursuant to its open file policy.

there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. *Hampton,* 86 S.W.3d at 612.

The State called Brewer as its first witness. Brewer testified that she was taking Miquel, a family friend, home. As she got into her car, she saw Red walk past. She and Miquel heard gunshots and looked up. She saw sparks coming from a gun and heard Miquel say, "That's Corey." She saw the shooter bend down as if he had dropped something, stand up, and start shooting again. The shooter then walked to the back of the apartment complex where Freeman and Johnson lived. Brewer checked on Red, went to her apartment to call the police, and came back to Red. When she did, she saw Freeman and Johnson speed away from the complex. Brewer later spoke with the police and told them that she saw Freeman shoot Red.

The State provided Freeman's counsel with a copy of Brewer's statement after her direct examination. Brewer's statement included the following:

> I was in my car fixin [sic] to leave and I saw Red walk past my car. Red turned the corner and then I heard shots. I looked up and saw Corey shooting at Red. Corey fired a couple of shots, stopped, then fired two more shots. Red was running and ducking. I saw the flash coming from Corey's gun. I turned around the corner and that's when I saw Red laying on the ground. Corey got into his car, a gray or silver Mustang and took off out of the apartments. I haven't seen him since that night.

In support of his motion for mistrial, Freeman pointed out that Brewer's statement made no reference to Miquel and contended that the investigating officer probably caused his name to be omitted. Freeman argued that the trial disclosure of Miquel's name had "obliterated" his planning, defensive theory, and strategy and, therefore, that he had been blind-sided because he now realized that the State's identification was based upon an unknown person that he could not subject to cross-examination. Freeman advised the trial court that, had he known about Miquel, he would have tried to find and interview him, and might have possibly called him as a witness.

Unquestionably, it would have benefitted Freeman to know prior to trial that Brewer would testify that she was with Miquel; that she heard him say "[t]hat's Corey"; and that her identification of Freeman was based, at least in part, on Miquel's comment. We do not doubt that this lack of information caused Freeman's counsel to misjudge the State's trial strategy. The State's failure to provide Freeman with information that put him at a tactical disadvantage, however, does not automatically constitute a *Brady* violation.

■■■■ The *Brady* rule recognizes that the State is in the unique position of being an advocate while striving to obtain a just result. *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). It is not a general discovery rule and does not require the State to share all useful information with the defendant. *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Nor does it displace the adversary system. *Bagley,* 473 U.S. at 675, 105 S.Ct. 3375. The State is not required to seek out exculpatory evidence independently on the defendant's behalf or to furnish him with exculpatory or mitigating evidence that is fully accessible from other sources. *Harm v. State,* 183 S.W.3d 403, 407 (Tex. Crim.App.2006).

The record does not establish that the trial court abused its discretion. Free-

man's contention is more of a discovery concern than a *Brady* complaint. Brewer did not recant her written statement, and the fact that someone else would presumably identify Freeman as the shooter was not exculpatory. Brewer believed that Freeman was the shooter when she met with the police, and she testified at trial that Freeman was the shooter. Her trial testimony that she saw the gun flashes, saw the shooter bend down and then stand back up and fire additional shots, and later saw Freeman leave the complex in his car is consistent with her written statement. Her trial testimony about Miquel explains why she believed Freeman was the shooter. This additional information was equally available to both attorneys. Freeman's second issue is overruled.

### 3. Did the Trial Court Err by Denying Freeman's Confrontation Clause Objection?

■ Freeman argues that the admission of Miquel's comments via Brewer's testimony violated his constitutional right to confront the declarant. *See Crawford v. Washington,* 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (the Sixth Amendment guarantees the accused the right to confront the witnesses against him). The confrontation clause applies only to testimonial evidence. *Spencer v. State,* 162 S.W.3d 877, 879 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd). Spontaneous statements to acquaintances are not testimonial. *Woods v. State,* 152 S.W.3d 105, 114 (Tex.Crim.App.2004); *see also Crawford,* 541 U.S. at 51, 124 S.Ct. 1354 ("[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"). Brewer testified that Miquel was a family friend. He had been at her apartment with her family, and she was taking him home when the shooting oc-

curred. The comments he made to her were in immediate response to the shooting both had just observed. These comments were not testimonial, and the trial court did not err when it denied Freeman's objection. Freeman's third issue is overruled.

### 4. Did the Trial Court Err by Denying Freeman's Hearsay Objection?

■ Freeman also argues that Miquel's comments were inadmissible hearsay. The State does not dispute that they are hearsay but contends that they fall within the present-sense-impression exception. Tex.R. Evid. 803(1). The trial court's decision to admit evidence is reviewed under an abuse of discretion standard. *Burden v. State,* 55 S.W.3d 608, 615 (Tex.Crim. App.2001). An appellate court may not reverse that decision unless it falls outside the zone of reasonable disagreement. *Id.*

■ The present-sense-impression exception requires that the statement be made simultaneously with the event or immediately thereafter and that it describe or explain an event or condition. Steven Goode et al, *Courtroom Handbook on Texas Evidence* 507 (2005). The exception's rationale is that the declarant's statement is free from the defects of memory, that there is little or no time for calculated misstatement, and that the statement is usually made to someone with equal opportunity to observe and thus check a misstatement. *Rabbani v. State,* 847 S.W.2d 555, 560 (Tex.Crim.App.1992).

In *Rabbani,* present-sense-impression evidence was used to establish identity in a murder trial. A witness was allowed to testify that, the day before the murder, the victim was standing in front of a window and said that he saw the defendant outside. *Id.* at 559. The testimony was relevant because it indicated that the defendant was in the vicinity of the victim's

home prior to his murder. Because the statement described something the victim was observing and was made at the same time as he observed it, the court concluded that it was a present sense impression. *Id.* at 560. The same situation exists here. Miquel's statement "[t]hat's Corey" was made as he watched the shooting, and it described what he had just seen. It constitutes a present sense impression; thus, the court did not err by allowing this testimony. Freeman's fourth issue is overruled.

### C. Other Evidentiary Rulings.

#### 1. Did the Trial Court Err by Compelling Johnson to Testify?

■ Freeman and Johnson were ceremonially married on February 22, 2002. Freeman contends that he and Johnson were previously common-law married. Therefore, he argues that the spousal privilege applied and that Johnson could not be compelled to testify against him. *See* Tex.R. Evid. 504(a). The trial court conducted a pretrial evidentiary hearing pursuant to Tex.R. Evid. 104(a) to determine whether the spousal privilege applied. Following that hearing, the trial court ruled that a common-law marriage did not exist and that Johnson would be required to testify. We review this decision for an abuse of discretion. *McDuffie v. State*, 854 S.W.2d 195, 212–13 (Tex.App.-Beaumont 1993, pet. ref'd). While performing this review, we consider the evidence in the light most favorable to the trial court's ruling. *Jasper v. State*, 61 S.W.3d 413, 419 (Tex.Crim.App.2001).

Freeman had the burden of proof to establish that a common-law marriage existed. *Welch v. State*, 908 S.W.2d 258, 264–65 (Tex.App.-El Paso 1995, no pet.). This required proof that (1) Freeman and Johnson agreed to be married, (2) they lived together after the agreement in Texas as husband and wife, and (3) they represented to others that they were husband and wife. *Colburn v. State*, 966 S.W.2d 511, 514 (Tex.Crim.App.1998). The State does not dispute that Freeman and Johnson were living together when Red was killed but focuses its attention on Johnson's actions shortly before and after the shooting to argue that the trial court had sufficient evidence to conclude that no informal marital relationship exited.

Freeman testified himself, and he called several friends and family members as witnesses. Their testimony established that Freeman and Johnson moved into the apartment complex together sometime in 2001. Several witnesses testified that they understood Freeman and Johnson were married, that Freeman and Johnson conducted themselves as a couple, and that Johnson treated Freeman's son as her own. Freeman testified that, when they moved in together in 2001, they agreed to become husband and wife. Three days after the shooting, Freeman and Johnson applied for a marriage license and were formally married shortly thereafter.

Other evidence was inconsistent with an informal marriage agreement. Detective Elterman testified that he met with Johnson two days after the shooting. Johnson referred to Freeman as her boyfriend, and she indicated that they were living together. Johnson provided the police with a written statement and personal information sheet. She listed her mother as her emergency contact person on the information sheet, and in her affidavit, she referred to Freeman by name rather than as her husband. Johnson executed an apartment lease in August 2001 when she and Freeman moved into the apartment complex together. On the space for spouse, Johnson indicated "not applicable."

The trial court was, thus, presented with conflicting evidence concerning whether, at

the time of the shooting, Freeman and Johnson had agreed to be married and were representing to others that they were married. Viewing this evidence in the light most favorable to the trial court's ruling, we cannot conclude that the trial court abused its discretion when it held that Freeman did not carry his burden of proof. Freeman's sixth issue is overruled.

*2. Was Johnson's Written Statement Inadmissible Hearsay?*

 The State called Johnson as a witness and attempted to ask her about a written statement that she provided to Detective Elterman. When Johnson did not respond, the trial court ordered her to answer the State's questions and threatened to hold her in contempt. Johnson testified that she recalled providing a written statement, and she identified the signature on State's Exhibit 3 as her own. Johnson then testified that she did not recall providing the statement to Detective Elterman, and she refused to answer any further questions about it. The trial court ordered Johnson removed from the courtroom, and the State called Detective Elterman. He testified that Johnson provided the police with a statement on February 18, 2002, and he identified State's Exhibit 3 as that statement. The trial court allowed the State to introduce State's Exhibit 3 into evidence to impeach Johnson's testimony that she did not recall providing it to Detective Elterman.

Freeman contends the trial court abused its discretion because the statement itself is hearsay and because it contains hearsay statements allegedly made by him to Johnson. Freeman's double hearsay objection has not been preserved for our review. Freeman initially objected to Johnson's statement because it was hearsay and had been disavowed by Johnson. Freeman then objected because the statement's admission denied him his right of confronta-

tion and cross-examination. Neither objection preserves a double hearsay issue. *See Ricketts v. State,* 89 S.W.3d 312, 319 n. 1 (Tex.App.-Fort Worth 2002, pet. ref'd) (hearsay objection does not preserve a double hearsay issue).

The trial court did not abuse its discretion by admitting Johnson's statement for impeachment purposes because her testimony was equivocal. *See McGary v. State,* 750 S.W.2d 782, 786 & n. 3 (Tex. Crim.App.1988) (unless a witness unequivocally admits making a prior inconsistent statement, it may be used for impeachment). Moreover, the record shows no harm. Johnson subsequently reconsidered her refusal to testify, and she testified about the matters covered in her statement. Freeman's seventh issue is overruled.

*3. Did the Trial Court Err by Denying Freeman's Motion for Mistrial after Evidence that Crack Cocaine had been Stolen from Freeman's Apartment was Admitted?*

 Brewer testified that someone broke into Freeman and Johnson's apartment and stole crack cocaine. Freeman objected, contending that this was inadmissible hearsay. The trial court sustained Freeman's objection and instructed the jury to disregard Brewer's statement. Freeman then moved for a mistrial. The trial court overruled his motion. Freeman argues that this was an abuse of the trial court's discretion.

 The general rule is that a prompt instruction to disregard will cure the prejudicial effect associated with an improper question and answer concerning an extraneous offense. *Ovalle v. State,* 13 S.W.3d 774, 783 (Tex.Crim.App.2000). To justify a mistrial, the testimony must be so prejudicial that expenditure of further

time and expense would be wasteful and futile. *Ladd,* 3 S.W.3d at 567.

Freeman contends that such a situation is present because Brewer's statement allowed the State during closing argument to paint him as a drug dealer and a bad person in general. Freeman's position ignores both what occurred immediately after his objection and what subsequently occurred during trial. First, when the trial court sustained Freeman's objection, the State did not ask Brewer any further questions about the break-in. Second, during Freeman's own testimony, he testified about drugs and drug usage in his apartment. Freeman testified that, when he moved in with Johnson, he knew that she had a cocaine habit. He denied using or selling drugs himself, pointed to the fact that he never failed a drug test at work, and contended that his lifestyle was inconsistent with drug dealing. He testified that, if any drugs were taken from his apartment, they would have belonged to Johnson. In fact, Freeman contended that Johnson had been heavily using drugs the day before the shooting.

Freeman has failed to establish the level of prejudice necessary to constitute an abuse of discretion. The jury was properly and timely instructed to disregard Brewer's single remark concerning crack cocaine. The State's closing argument was not directly tied to that single remark but reflects significant other evidence—much of it coming from Freeman's own testimony on direct. We cannot say that the trial court abused its discretion when it denied Freeman's motion for mistrial, and his eighth issue is overruled.

*4. Did the Trial Court Err by Allowing Daniels to Testify that She Purchased Drugs from Freeman?*

■ The State called Daniels as a rebuttal witness. During her cross-examination, Freeman's counsel asked if Johnson was a known drug addict, and counsel confirmed that, when Freeman threatened to retaliate against Red for breaking into his apartment and stealing drugs, Freeman did not say the stolen drugs were his. The State argued that these questions opened the door to further testimony. The trial court conducted a hearing outside the jury's presence and ruled that the State could ask Daniels if she had ever personally purchased drugs from Freeman. Freeman argues that the trial court abused its discretion because his cross-examination did not open the door to this testimony or, alternatively, that the probative value of this evidence was outweighed by its unfair prejudice.

The only motive ever developed for the shooting was the theft of crack cocaine from Freeman and Johnson's apartment. When Freeman cross-examined Daniels, the jury had already heard her testify that Freeman was looking for Red because of the theft of his drugs, and the jury had heard and seen Johnson's statement in which she told the police that Freeman had threatened to hurt Red in retaliation for stealing his cocaine. Freeman understandably wanted to undermine this motive by establishing that the stolen cocaine actually belonged to Johnson. Daniel's testimony that she had purchased drugs from Freeman out of his apartment was relevant because it rebutted the suggestion that Freeman had no interest in any crack cocaine that might have been stolen from his apartment.

■ Even though relevant, Daniel's testimony may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX.R. EVID. 403. When evaluating a trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse

of discretion" because the trial court is in a superior position to gauge the impact of the relevant evidence. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex.Crim.App.1999). In conducting a Rule 403 analysis, the court is to consider (1) the probative value of the evidence, (2) the potential to impress the jury in some irrational yet indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence. *Prible v. State*, 175 S.W.3d 724, 733 (Tex.Crim.App.2005).

Daniel's testimony had probative value because it went to Freeman's motive and it put her personal knowledge in context. The challenged testimony consisted of only two questions. The State needed to establish a motive. Allowing these two questions not only addressed that need but also kept the testimony in context because they were asked in immediate response to Freeman's cross-examination. Finally, the evidence was not likely to impress the jury in some irrational but indelible way. Daniel's rebuttal testimony was not the first time that the jury had heard that the crack cocaine belonged to Johnson rather than Freeman. When Johnson reconsidered her refusal to testify, she testified in response to Freeman's cross-examination that the cocaine belonged to her and not Freeman, acknowledged her drug addiction, and agreed that Freeman was required to take random drug tests at work. Daniel's testimony provided a logical explanation for why, nonetheless, the crack cocaine could still belong to Freeman. Issue nine is overruled.

*5. Did the Trial Court Err by not Allowing Evidence of Red's Prior Car Burglaries?*

7. Freeman was allowed to testify that Red was a crack addict and was unemployed but that he always seemed to have money. Freeman also testified that Red had tried to sell

■ Freeman argues that the trial court abused its discretion by not allowing evidence of Red's prior convictions for burglarizing cars or evidence that he was known as a car burglar. Freeman's principal argument is that this evidence was admissible to show that he acted reasonably to defend his property. Freeman testified on his own behalf. He told the jury that on the day of the shooting his car alarm woke him and that he went outside and saw that Red had his car door open. Freeman yelled, Red took off running, and Freeman shot at him to make him stop. On cross-examination, Freeman clarified that at the time of the shooting he did not know who was breaking into his car and did not learn that he had shot Red until two weeks to a month later.

Because Freeman testified that he did not know who was breaking into his car, Red's prior criminal history and general reputation would have had no bearing on the reasonableness of Freeman's actions. The trial court did not abuse its discretion by not admitting this evidence.[7] Issues ten and eleven are overruled.

*D. Did the Trial Court Err When It Admonished Freeman after his Trial Counsel Indicated an Intention to Put on No Defense?*

■ During the pretrial hearing on the admissibility of Brewer's testimony, Freeman's trial counsel stated that allowing Brewer to testify about Miquel's comments was so unfair:

> [T]hat my proclivity would be to just make this argument to the Court and just sit here and let the State put on the rest of their case without any cross-examining, without any defense, and we'll just go to the Courts of Appeal and

him car stereos that he believed were stolen. Consequently, the exclusion of additional evidence of Red's criminal history and reputation would be harmless in any event.

see what they say about it. Now, that's something I certainly don't want to do, but I have done it in the past and I would be loath to do it, but I will do it.

The trial court ruled that Brewer's testimony would be admitted, and trial counsel then began what the trial court would later accurately describe as juvenile behavior.[8]

During his opening statement, Freeman's trial counsel told the jury: "And if you folks see me sitting here and not participating in this trial because I don't think that—" The State objected, the trial court sustained the objection, and counsel announced that he had no further opening. During Brewer's direct testimony, when the State proffered exhibits and the trial court asked counsel if he had any objection, he made comments such as:

We have no comments, no objections, nor anything else other than our motion for continuance to try to find the missing witness who we learned about this morning.

I have no comments, no objections, no anything.

I'm not prepared at this time, Your Honor, to consider that. I renew my motion for continuance.

Your Honor, excuse me, but my position is I am not in a position to make objections to these exhibits. So if the Court finds them to be admissible, the Court may admit them.

The Court can construe the record any way it wants to, Your Honor.

After this last comment, the trial court excused the jury, confirmed that trial counsel was retained, and advised Freeman:

[THE COURT]: Mr. Freeman, certain rulings have been made which your

attorney of record disagrees with. That is the whole purpose of appellate records, Mr. Freeman. However, your attorney has stated in open court on the record that he basically intends not to offer a defense for you, not to basically represent you, and to just sit there and let the State continue with their case. You understand that?

[FREEMAN]: Yes, ma'am.

THE COURT: You were present when he made those statements in court; is that correct?

[FREEMAN]: Yes, ma'am.

THE COURT: We have had one witness so far. You were present when he made the statements regarding certain evidence being admitted. Do you recall that?

[FREEMAN]: Yes, ma'am.

THE COURT: You have a choice, Mr. Freeman. Because he is retained, I cannot remove him from the case. That is entirely your decision. You have the choice to either proceed forward with Mr. Gray, knowing what he intends to do in not offering a defense, not questioning witnesses, etcetera. Or you can remove Mr. Gray and the Court will appoint you an attorney. It is your ·choice, but I will tell you this. If you choose to continue with Mr. Gray, any ineffective assistance of counsel claim that may try to be raised in all likelihood will no longer be valid because you will be choosing to go forward knowing that that is what he's choosing to do. Do you understand that?

[FREEMAN]: Yes, ma'am.

THE COURT: So it's your choice, Mr. Freeman.

[FREEMAN]: I'll continue.

8. We note that Freeman is represented by different counsel on appeal and that appellate counsel's representation before this court has at all times been professional and conscientious.

Freeman argues that the trial court erred because it did not advise him that, if new counsel was appointed, they would have ten days to prepare for trial pursuant to Tex.Code Crim. Proc. Ann. art. 1.051(e) (Vernon 2005) and that this effectively denied him the statutorily required preparation period. However, Article 1.051's application is not before us. The statute was never triggered because Freeman did not receive appointed counsel. Moreover, from this exchange, we cannot say whether the court would have denied a request for additional time if Freeman had accepted the trial court's offer or whether the court would have even continued with the trial.[9] The issue before us is: Was the trial court required to advise Freeman of the statute's preparation provision so that he could make an informed decision on whether to discharge his retained counsel?

First, we are aware of no authority requiring the trial court to even advise Freeman that he could dismiss his retained counsel. Second, the statute's only expressly required admonishment is in Article 1.051(g). This requires the court to advise a defendant wishing to waive the right to appointed counsel of the dangers and disadvantages of self-representation. Neither this provision, nor any case construing it, indicates that the trial court is also required to advise the defendant that, if he is appointed counsel, his counsel will have at least ten days to prepare for trial. Applying this by analogy, the trial court confirmed that Freeman understood the risks of proceeding with his retained counsel. We cannot conclude that more was required. Freeman's fifth issue is overruled.

*E. Did the Trial Court Err by not Sua Sponte Granting a Mistrial?*

▋ Freeman argues that the trial court erred by not sua sponte granting a mistrial when the State's counsel commented upon his exercise of the Sixth Amendment right to counsel. Specifically, Freeman complains that, when the State asked Johnson who hired and paid for Freeman's attorney and if this attorney had been representing him since he was in jail, the State was attempting to prove Freeman's guilt by pointing to the fact that he had sought the assistance of counsel. Freeman acknowledges that he did not object to these questions at trial but contends that this case is comparable to *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir.1980), and that no objection was required. The State responds that Freeman's failure to object waived any error. *See* Tex.R.App. P. 33.1(a).

▋ The general rule is that a party must make a timely and specific objection at trial to preserve an issue for appellate review. *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex.Crim.App.1999). This rule applies to all objections except complaints involving violations of "rights which are waivable only" and denials of "absolute systemic requirements." *Aldrich v. State*, 104 S.W.3d 890, 895 (Tex.Crim.App.2003). Rights that are waivable only include the right to assistance of counsel and the right to trial by jury. Absolute systemic requirements include jurisdiction of the person, jurisdiction of the subject matter, and a penal statute's "compliance with the Separation of Powers Section of the state con-

---

9. In our discussion of this issue, we need not decide if the trial court would have been required to provide appointed counsel ten days to prepare for trial. The ten-day preparation period is not mandatory each time counsel is appointed. For example, Article 1.051(h) provides that, if a defendant waives his right to counsel but subsequently withdraws that waiver, the trial court has the discretion to provide appointed counsel ten days to prepare.

stitution." *Saldano v. State,* 70 S.W.3d 873, 888 (Tex.Crim.App.2002).

In *Saldano,* the court held that the failure to object to evidence that violated the defendant's rights under the Equal Protection Clause waived any error because this was neither a waivable only right nor an absolute systemic requirement even though the evidence concerned the defendant's constitutional rights. *Id.* at 889. We believe the same holds true here. The State's examination of Johnson concerned Freeman's constitutional right to the assistance of counsel, but this was an evidentiary issue that required an objection. Because Freeman did not object, issues sixteen and seventeen are overruled.

*F. Freeman's Requests for Lesser Included Offenses.*

■ Freeman argues that the trial court erred by not submitting the lesser included offenses of criminally negligent homicide and aggravated assault in the charge. The trial court initially declined to include aggravated assault, but the court's charge included instructions on the lesser included offenses of aggravated assault and manslaughter. Issue fourteen is, therefore, overruled.

■ The Texas Court of Criminal Appeals has adopted a two-prong test to determine if the trial court is required to include an instruction on a lesser included offense: (1) the lesser included offense must be included within the proof necessary to establish the offense charged and (2) some evidence must exist in the record that, if the defendant is guilty, he is guilty only of the lesser offense. *Hampton v. State,* 109 S.W.3d 437, 440 (Tex.Crim.App. 2003). The State does not dispute that criminally negligent homicide is a lesser included offense but contends that there was no evidence that if Freeman was guilty it was only of that offense.

■ The distinction between murder, manslaughter, and criminally negligent homicide is the defendant's culpable mental state. Murder, as alleged in the indictment, required proof that Freeman knowingly or intentionally caused Red's death or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Red's death. *See* TEX. PEN.CODE ANN. § 19.02(b)(1) (Vernon 2003). Manslaughter requires proof that the defendant recognized the risk of death but consciously disregarded it. For criminally negligent homicide, the defendant is not, but ought to be, aware of the risk that death will result from his conduct. *Masterson v. State,* 155 S.W.3d 167, 171 (Tex. Crim.App.2005).

Freeman testified that, when he heard his car alarm, he grabbed his revolver and went outside. Freeman knew the gun was loaded. When Red took off, Freeman pointed the gun at him and fired two or three times. Freeman testified that he did so to scare Red and make him stop running. Freeman denied any intention to kill or injure Red and admitted that he did not know where the bullets would go.

This testimony does not justify the submission of a lesser included instruction on criminally negligent homicide. The Texas Court of Criminal Appeals has held that a defendant was presumed to know the risks of injury or death by exhibiting a loaded, cocked pistol. *See Salinas v. State,* 644 S.W.2d 744, 746 (Tex.Crim.App.1983). In *Thomas v. State,* 699 S.W.2d 845, 849–52 (Tex.Crim.App.1985), the court recognized that, in most instances involving a firearm, the evidence will not justify a criminally negligent homicide instruction because the defendant will ordinarily have some appreciation of the risks. Here, there was no evidence that Freeman did not appreciate the risks inherent with a firearm, that he did not know his revolver was loaded, or

that it accidentally discharged. In fact, the evidence shows that he intentionally fired a loaded weapon.

■ Moreover, even if he was entitled to an instruction, the record shows no harm. The harm from denying a lesser offense instruction stems from the potential to place the jury in the dilemma of convicting for a greater offense in which the jury has a reasonable doubt or releasing entirely from criminal liability a person the jury is convinced is a wrongdoer. *Masterson,* 155 S.W.3d at 171. The manslaughter instruction provided the jury with a compromise. Freeman's testimony, if believed, squarely presented the jury with a situation of reckless conduct. Their decision to reject that option and find him guilty of murder indicates that the jury legitimately believed he was guilty of the greater, charged offense. Issue thirteen is overruled.

*G. Is the Jury's Rejection of Freeman's Defenses Supported by Factually Sufficient Evidence?*

*1. Defense of Property.*

■ Freeman contends that he was justified in using deadly force to defend his property and that the jury's implied rejection of this defense was based upon factually insufficient evidence. When a defendant raises a factual sufficiency challenge to the jury's implied adverse finding on a defensive theory, we perform a factual sufficiency review of the jury's verdict. *See, e.g., Roy v. State,* 161 S.W.3d 30, 34–35 (Tex.App.-Houston [14th Dist.] 2004, no pet.). This requires that we begin with the assumption that the evidence supporting the jury's verdict is legally sufficient. *Clewis v. State,* 922 S.W.2d 126, 134 (Tex. Crim.App.1996). We view all of the evidence in a neutral light, without favoring either party. *Johnson v. State,* 23 S.W.3d 1, 6–7 (Tex.Crim.App.2000). We will set aside the verdict only if the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or if the verdict is against the great weight and preponderance of the conflicting evidence. *Watson v. State,* 204 S.W.3d 404, 414 (Tex.Crim.App.2006).

■ When reviewing the evidence, we must give appropriate deference to the jury findings in order to prevent intruding on the fact-finder's role as the sole judge of the weight and credibility of the evidence. *Johnson,* 23 S.W.3d at 7. Therefore, unless the record clearly reveals a different result is appropriate, we "must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor." *Id.* at 8.

A person in lawful possession of property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's unlawful interference with the property. TEX. PEN.CODE ANN. § 9.41(a) (Vernon 2003). A person unlawfully dispossessed of property by another is justified in using force against the other when and to the degree the actor reasonably believes the force is immediately necessary to recover the property if the actor uses the force immediately or in fresh pursuit after dispossession and the actor reasonably believes the other had no claim of right when he dispossessed the actor. Section 9.41(b).

A person is justified in using deadly force against another to protect property if (1) he could otherwise use force (2) when and to the degree he reasonably believes deadly force is immediately necessary to prevent the other who is fleeing immediately after committing burglary, robbery, aggravated robbery, or theft during the nighttime from escaping with the property

and (3) he reasonably believes the property cannot be recovered by any other means. TEX. PEN.CODE ANN. § 9.42 (Vernon 2003). A reasonable belief is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. TEX. PEN.CODE ANN. § 1.07(a)(42) (Vernon Supp.2006).

The jury was provided two explanations for the shooting. Freeman contended that he reacted to a car burglary in the middle of the night and that he shot at Red to make him stop running and return whatever he had taken from Freeman's car. Other witnesses testified that Freeman had threatened to hurt or kill Red in retaliation for stealing crack cocaine from his apartment, that Freeman had been looking for Red, and that on the night of the shooting he sent someone to see if Red was at a particular house. It was the jury's responsibility to resolve this conflicting evidence. Their verdict necessarily reflects a credibility determination that we cannot second guess. The evidence supporting a determination that Red was shot in retaliation for the crack cocaine theft and not to recover property taken from Freeman's car is neither so weak that the jury's verdict is clearly wrong and unjust nor is it against the overwhelming weight of the evidence. Issue twelve is overruled.

*2. Sudden Passion.*

 Freeman also argues that the jury's rejection of his sudden passion defense was based upon factually insufficient evidence. Murder is ordinarily a first degree felony, but if the defendant proves by a preponderance of the evidence that he caused the death under the immediate influence of sudden passion arising from an adequate cause, it becomes a second degree felony. TEX. PEN.CODE ANN. § 19.02(d) (Vernon 2003). During the punishment phase of the trial, Freeman testified and told the jury that, when he shot Red, he was angry because "[he] was tired of getting ripped off." The trial court instructed the jury on sudden passion and included a jury issue on sudden passion. The jury found against Freeman on this issue.

 Section 19.02 defines "adequate cause" to mean cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Section 19.02(a)(1). The statute defines "sudden passion" to mean passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation. Section 19.02(a)(2). Ordinary anger is not adequate cause. *Ybarra v. State*, 890 S.W.2d 98, 109 (Tex.App.-San Antonio 1994, pet. ref'd). The defendant's action must be taken while in an excited and agitated state of mind arising out of the victim's direct provocation. *Merchant v. State*, 810 S.W.2d 305, 310 (Tex.App.-Dallas 1991, pet. ref'd).

For the same reasons the jury was entitled to reject Freeman's defense of property defense, it was entitled to reject his sudden passion defense. The evidence was sufficient to allow the jury to determine that the shooting was not in response to a break-in of Freeman's car that night but in retaliation for the prior theft of cocaine from Freeman's apartment. Issue eighteen is overruled.

*H. Cumulative Effect.*

Freeman's final issue is that the cumulative effect of the trial court's errors warrants a reversal of his conviction. We have considered, and overruled, each of his issues. Cumulative consideration of the

issues raised by Freeman does not alter our analysis. Issue nineteen is overruled.

## V. *Holding*

The judgment of the trial court is affirmed.