**Affirmed and Memorandum Opinion filed October 31, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00798-CR

### ABDERRAHIM ELMAGHRAQUI, Appellant

### V.

### THE STATE OF TEXAS, Appellee

## On Appeal from the 351st District Court
### Harris County, Texas
### Trial Court Cause No. 1118828

## M E M O R A N D U M    O P I N I O N

A jury convicted Adberrahim Elmaghraoui of murder, sentenced him to life in prison and assessed a fine of $7,500. We affirm the trial court's judgment.

Appellant pled guilty to the murder of his wife, Amina Fettach. The punishment-phase charge included a special issue on sudden passion arising from an adequate cause. The jury made a negative finding on the special issue.

In a single issue, appellant claims the trial court erred in admitting, over objection, an out-of-court statement made by Amina. Appellant argues the

statement was hearsay and its admission violated his rights under the Confrontation Clause of the Sixth Amendment. *See* U.S. Const. amend. VI. At issue is the testimony of Amina's sister, Alwai Osman. Alwai recounted the following statement made to her by Amina, "She said that she told him if he going to kill her -- she said that she told him if he's going to kill her, not to do it in front of their child." Alwai identified "him" as Amina's husband.

Under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), testimonial hearsay statements of witnesses absent from trial are admissible over a Sixth Amendment Confrontation Clause objection only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Davis v. State*, 169 S.W.3d 660, 666 (Tex. App.—Austin 2005), *aff'd*, 203 S.W.3d 845 (Tex. Crim. App. 2006). A statement is "testimonial" if it constitutes a solemn declaration made for the purpose of establishing some fact. *Amador v. State*, 376 S.W.3d 339, 342 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

"Spontaneous statements to acquaintances are not testimonial." *Freeman v. State*, 230 S.W.3d 392, 401 (Tex. App.—Eastland 2007, pet ref'd). *See also Woods v. State,* 152 S.W.3d 105, 114 (Tex. Crim. App. 2004) (casual remarks spontaneously made to acquaintances do not fall within the categories of testimonial evidence described in *Crawford*); and *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354 ("[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"). Amina's statement to her sister at a party was not testimonial. Therefore its admission did not violate appellant's rights under the Confrontation Clause of the Sixth Amendment.

Appellant also argues the statement was inadmissible hearsay. The State

sought to elicit the statement below and persuaded the trial court to admit the statement over appellant's hearsay objection. We note, however, that the State's appellate brief does not argue that the statement was not hearsay or otherwise attempt to defend its admission. Instead, the State argues that the statement's admission was harmless error.

The erroneous admission of hearsay is non-constitutional error. *See Fischer v. State,* 207 S.W.3d 846, 860 (Tex. App.—Houston [14th Dist.] 2006), *aff'd*, 252 S.W.3d 375 (Tex. Crim. App. 2008). Non-constitutional errors require reversal only if substantial rights are affected. *Id*. citing Tex. R. App. P. 44.2(b). "Error affects a substantial right when it has a substantial and injurious effect or influence in determining the jury's verdict." *Rivera-Reyes v. State*, 252 S.W.3d 781, 787 (Tex. App.—Houston [14th Dist.] 2008, no pet.). If, after examining the record as a whole, the reviewing court is reasonably assured the error did not influence the jury verdict or had but slight effect, the error is harmless. *Id.*

Appellant claims admission of the hearsay statement had a substantial and injurious effect on the jury's finding against sudden passion. Appellant asserts "[b]ecause the jury heard that Amina and Elmaghraoui had previously conversed about Amina's death at his hands, they were more likely to refuse to find sudden passion."

A defendant convicted of murder may raise the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause at the punishment stage of trial. Tex. Penal Code Ann. § 19.02(d) (West 2011). If, by a preponderance of the evidence, the defendant proves this issue in the affirmative, the offense is a second degree felony rather than first degree. *Id.* "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to

render the mind incapable of cool reflection. *Id., § 19.02(a)(1).* "Sudden passion" means passion directly caused by and arising out of provocation of the individual killed or another acting with the person killed and which arises at the time of the offense and is not solely the result of earlier provocation. *Id., § 19.02(a)(2).* The defendant must show "there was a causal connection between the provocation, the passion, and the homicide." *McKinney v. State,* 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). The mere fact that someone acts in response to provocation of another is not enough. *Trevino v. State,* 100 S.W.3d 232, 241 (Tex. Crim. App. 2003).

According to appellant, the problem between Amina and him was her relationship with her sister's husband, Mustapha Benallou. Appellant testified that in 2005, approximately two years before the murder, Amina allowed Mustapha to come to their home when he was not there and "this [was] against our Islamic religion." Amina and Mustapha were sitting beside each other and talking. Appellant witnessed no physical contact. Appellant kicked Mustapha out and told him not to talk to Amina or come to his home again. Appellant ended his relationship with Mustapha. Appellant talked to Amina and Mustapha and asked them to quit meeting but it happened a few more times in 2006. Appellant caught Mustapha at his home one more time. Appellant testified that his son, Yassir, told him of a few more times and told appellant they were sitting together. According to appellant, Amina met with Mustapha less than ten times. In 2007, appellant followed Amina to Mustapha's house but he could not get in. Appellant testified Amina had no right to go to Mustapha's house.

Three weeks before the murder, appellant moved out of the apartment he shared with Amina and Yassir. Appellant returned to the apartment during that time to see his son. He testified that he moved out because she was continuing to see Mustapha and that if she did not stop, they would divorce. But according to

4

appellant, he and Amina did not talk about divorce until the day of the murder. That day, they went to the washateria together and returned to Amina's apartment and went upstairs where appellant could wash before prayer.

According to appellant, Amina said she was not going to end her relationship with Mustapha and appellant told her they needed to divorce. Appellant admitted that he was hurt and angry when Amina told him she was not going to end her relationship with Mustapha. They talked about divorce and then Amina went downstairs. She returned with a knife and came towards him. Amina wanted to stab him and he tried to pull the knife from her hand, cutting his hand twice before he took it. Appellant "lost his mind." He did not recall stabbing Amina seventeen times.

Appellant covered Amina with a sheet, cleaned his hand where it was cut, and called a friend, Mohammed Tahir. Appellant claimed he wanted to call the police but did not speak English so he asked Mohammed to call the police. Mohammed refused and told appellant to call the police. Appellant called 911.

Mohammed Tahir testified appellant called him the night of the murder. Appellant told Mohammed that he and Amina had a "big fight and she did not listen to him." According to appellant, "[h]e received an order from God to punish her and she died immediately." Appellant said he needed to get a lawyer. Mohammed told him to call the police.

Yassir testified to a history of domestic violence. According to Yassir, appellant became jealous when Amina started working and they would argue. The fights escalated and appellant began hitting Amina by throwing objects at her. It became a daily occurrence. Appellant began slapping Amina if he did not have anything to throw at her and he would hit her and shove her. The violence began escalating. Appellant threw a glass-topped table at Amina as well as two

5

televisions and a cell phone. He began threatening Amina with knives. Yassir testified it was "[p]retty much every day . . . it was a natural thing." Yassir witnessed appellant holding a knife to Amina while telling her, "I'm going to kill you and call the cops on myself." Yassir never saw his mother grab a knife and hold it to his father. According to Yassir, Amina was injured "a lot of times" suffering bruises and cuts. Yassir testified the police once came to the apartment but his mother denied anything was going on and they left.

Appellant denied Yassir's statements. Appellant disagreed there were huge fights; that he ever held a knife to Amina; that he threw a TV at her; that he threw a glass table at her; or that the police came to the apartment. Yassir said he heard his father talk about marrying another woman and that was about a year before his mother was murdered. Appellant denied ever talking about getting another wife.

Yassir testified the day of the murder he was at the home of his mother's friend, Farida, when his father came to pick him up. Yassir was about to go when Farida came out and pulled him into the house, while screaming at his father. According to Yassir, it was because she was on the phone with his mother and Amina wanted Yassir to stay there. Yassir said his father's eyes were "blood red, like . . . someone who's high" and he agreed that his father seemed "on edge." Yassir denied that his mother and Mustapha were spending time together alone and stated, "it's definitely not true."

It is Amina's alleged relationship with Mustapha that appellant claims was "adequate cause." However, the jury heard testimony from Yassir that there was no such relationship. The jury is the sole judge of the facts, the credibility of the witnesses, and the weight to be given the evidence. *Beckham v. State,* 29 S.W.3d 148, 152 (Tex.App.—Houston [14th Dist.] 2000, pet. ref'd). Therefore, the jury may believe or disbelieve all or part of any witness's testimony. *Jones v. State,*

6

984 S.W.2d 254, 258 (Tex. Crim. App. 1998). Reconciliation of any conflicts in the evidence falls within the exclusive province of the jury. *Heiselbetz v. State,* 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). Because the jury could have rejected appellant's version of events and concluded that appellant's claimed cause did not exist, the admission of the hearsay statement was not necessarily the basis for the jury's negative finding on appellant's claim of sudden passion.

Moreover, according to appellant, Amina's alleged relationship with Mustapha began two years before the murder and was therefore former provocation. Passion that is solely the result of former provocation does not qualify as sudden passion. *See McKinney*, 179 S.W.3d at 570 (an argument that began hours before the fatal shooting was not an adequate cause to give rise to an immediate influence of sudden passion).

The only act occurring immediately prior to the murder was, according to appellant, Amina's attempt to stab him with the knife. Appellant did not claim self-defense at trial, and he makes no such argument on appeal. Yassir's testimony of escalating domestic violence and appellant's repeated threats to Amina's life with a knife provided an additional basis, apart from the admission of the hearsay statement, for the jury's negative finding on appellant's claim of sudden passion.

For these reasons, we are reasonably assured the error in admitting the hearsay statement did not influence the jury's finding or had but slight effect and is therefore harmless. Appellant's issue is overruled and the judgment of the trial court is affirmed.

/s/     John Donovan
          Justice

Panel consists of Justices Christopher, Busby and Donovan.

Do Not Publish — TEX. R. APP. P. 47.2(b).