**Rudy RUBIO, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**NUMBER 13–15–00087–CR**

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed February 24, 2017

Discretionary Review Refused
December 13, 2017

Rehearing Denied May 18, 2017

Derek B. Hilley, Carlos A. Solis, Hillay & Solis Law, San Antonio, TX, for Rudy Rubio.

Douglas K. Norman, Assistant District Attorney, Mark A. Gonzalez, Nueces County District Attorney, Corpus Christi, TX, for the State of Texas.

Before Chief Justice Valdez and Justices Rodriguez and Benavides

## OPINION

Opinion by Chief Justice Valdez

A jury found appellant, Rudy Rubio, guilty of one count of aggravated sexual assault. *See* TEX. PENAL CODE ANN. § 22.021 (West, Westlaw through 2015 R.S.). The trial court sentenced appellant to life imprisonment. By two issues, appellant contends that the jury charge contains egregious error and the State failed to timely disclose *Brady* material. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (requiring that whether or not a defendant requests it, the State must disclose evidence known to it that is favorable or material to a defendant's guilt or punishment). We affirm.

### I. NON-UNANIMITY.

Relying on *Cosio v. State*, appellant argues that because K.H. testified as to several incidents of anal penetration and because no instruction in the charge informed the jury that it had to unanimously find that appellant was guilty of the same incident, the verdict was not unani-

mous. 353 S.W.3d 766, 772 (Tex. Crim. App. 2011). The State agrees that non-unanimity may occur if the State charges one offense but presents evidence that the defendant committed the charged offense on multiple but separate occasions. *See id.* However, according to the State, this rule does not apply to instances when the several similar acts of penetration occur as a part of the same criminal transaction or were committed by one continuous act of force or threat. And, the State reasons, in this case, appellant's acts were all a part of the same criminal transaction.

## A. Pertinent Facts

K.H. testified that after parking her car near a friend's house, appellant approached her claiming he was an undercover police officer and told her she needed to step out of her car because he needed to search it. According to K.H., when she complied, appellant asked her to put her hands on top of the hood of the car, and he performed a search of her body "like a regular cop." K.H. stated that appellant put her hands behind her back, led her to his car, and placed her in his car; however, when she attempted to get out of the car, the door was locked and would not open.

K.H. testified that appellant blindfolded her, took her to a building, carried her into a room, and threw her on a bed. According to K.H., she fell off the bed, appellant became angry at her, jumped on top of her, and "grabbed cocaine and he shoved it up [her] nose and shoved it back in [her] mouth." K.H. stated that appellant told her not to spit out the cocaine and that she was scared. K.H. recalled that appellant then "shoved his penis in [her] mouth" and took off her pants and underwear. K.H. testified that appellant put her on the bed. K.H. stated appellant then

turned me over on the bed and he put a pillow over my head and I was going—don't know what he was doing he was going back and forth and in and out, I kept hearing the door close and open and I—I kept trying to talk because I was scared, and I said, are you still there, or can I at least just keep talking because I don't know what's going on. And I said, if you're gonna leave can you at least put a blanket over me so I'm not just, you know, bare and laying upside down, and he grabbed a sheet and he put it over me while I was facing down.

K.H. testified that after she orally ingested the cocaine, appellant made her inhale another drug through her mouth. She said, "Then I would have an anxiety attack all over again and then he would sexually assault me again." The prosecutor stated, "We're gonna have to talk about each one of those times," and K.H. replied, "Okay." K.H. could not remember the "order" of each sexual assault so the prosecutor said, "Okay, tell us what you remember happening next." K.H. said, "I remember that he got on top of me and he started having sex with me and then he would drug me again, I would have another anxiety attack another time[.]" K.H. clarified that she meant that appellant had penetrated her vagina with his penis. She then stated, "At that point, I really can't remember. I know that—I know a few times that he did [perform sex acts on me] and one was through vaginal, another one he turned me around and I remember gripping on to the floor and trying to reach for anything I can grab while he was putting his penis in my anus. He was—after I started crying and I told him that it was hurting he stopped and he started putting cocaine all over my anus and he said that that was gonna make it not hurt as much." When asked by the prosecutor if appellant put anything else besides his penis in her anus, K.H. replied, "Yes. . . . He

grabbed—he grabbed a dildo and I saw it, it was flesh colored and he would put his penis in my vagina and the dildo inside of my anus at the same time." When asked by the prosecutor, "Did he sexually assault you in any other way," K.H. responded, "I can't remember. I just know everything was just repeated, and at one point, I was having anxiety attacks so much, so bad, that I was laying there and my eyes were rolling back behind my head and when I was able to get a clear picture, I got a clear picture I looked straight at him and he was laying in front of me jerking himself off." K.H. stated that while appellant engaged in the described activity, she was laying down curled trying to catch [her] breath and just trying to, you know, get back to normal."

K.H. said, "I knew that I wasn't supposed to die there. After I had got myself together and stopped hyperventilating, he turned me over and started—started having sex in my anus all over again." The prosecutor asked, "How many times did he sexually assault you by putting his penis in your anus?" K.H. replied, "At least three, maybe four, but three that I can think of." K.H. stated that appellant put his penis in her vagina "[m]aybe five" times. When asked how many times appellant sexually assaulted her, K.H. stated she could not recall the exact number but estimated it occurred "maybe 10, 11, times, maybe 12." K.H. testified that she had not consented to any of the acts performed.

K.H. stated that she noticed that people started arriving at the location, which was appellant's business location, and appellant then told her he was taking her home. K.H. said that appellant returned her cell phone and drove her back to her car. K.H. went home, told her mother what happened, and her mother called the police.

K.H. testified that she went to the hospital where a nurse examined her and that she talked to a police officer regarding the incident. The sexual assault nurse examiner who performed the examination of K.H. wrote in her report the following:

Patient states: "I was waiting outside my friend's house. Some guy came up to my car. He told me he was with the police and I should get out of the car. He had me put my hands on top of the car. He searched me. Then he put my hands behind me and told me to get in the car on the driver[']s side. He got in after me. He started driving away and I grabbed for the door to unlock it. He grabbed me by my hair and shoved me underneath the dash on the passenger side. He grabbed my hands behind my back and wrapped them with a belt. He told me if I screamed he would stab me and kill me. He took me to this place. He blindfolded me and put a sheet or sack over my head. He was pushing me and I fell onto a bag of glass. He grabbed a bag of cocaine and stuck it in my face. I inhaled and my mouth got dry. He picked me up and put me on the bed, it was a futon. Then he started touching me on my arms, my legs, my stomach and my face. He said if I did everything he said he would take me back to my car. He started taking off my clo[thes]. He was kissing me on my neck and my face. He started rubbing cocaine on my nipples, inside my vagina and inside my rectum. He then started sticking something up my vagina. When he turned on the light I saw a dildo in his hand. He would put both the dildo and himself, his penis in my vagina and my rectum. It just continued over and over again. Finally everything was done and he gave me my clothes and then he dropped me off."

The nurse noted in her report that there was "[n]o trauma" to K.H.'s labia majora, labia minora, hymen, vagina, cervix, and

perineum. However, the nurse noted that there was a "1/2 cm red tear" to K.H.'s rectum "@ 12 o'clock."

Police officer Gabriel Gutierrez testified that when he went to arrest appellant, appellant fled from him and ran out of his business's building to a nearby Whataburger. Officer Gutierrez said he had informed appellant that he was a police officer and had asked appellant to stop running; however, appellant continued running until Officer Gutierrez tackled him and then tased him.

Samantha Manning, a forensic scientist with the Texas Department of Public Safety in the DNA section, testified that, although she found sperm, she did not find any DNA belonging to appellant in the swab taken from K.H.'s vagina. Regarding the DNA extract from the sperm cell fraction of the vaginal swab, Manning stated that there were two components and that appellant had been "excluded" as the contributor of the major component in this profile, which belonged to K.H., and the minor component was "insufficient for comparison purposes," meaning that she could not make a comparison to anyone. Regarding the anal swab, the only DNA found by Manning belonged to K.H. Manning found DNA belonging to appellant on K.H.'s panties. Manning testified that the DNA found on two artificial phalluses found at the scene of the alleged aggravated assault belonged to appellant and did not belong to K.H.

Finally, in a video interview with police officers, appellant admitted to having sex with K.H. However, appellant claimed that K.H. had consented to the sexual acts.

## B. The Jury Charge

The State indicted appellant for ten counts of aggravated sexual assault of K.H. with all acts allegedly occurring on September 28, 2013. The State, however, abandoned three counts and only seven counts were submitted to the jury in the charge. The jury acquitted appellant of six counts and found him guilty of only count four. The indictment on count four stated, in relevant part,

[Appellant] did then and there intentionally or knowingly cause the penetration of the anus of K.H., Pseudonym, by defendant's sexual organ or an object unknown to the grand jury, without the consent of K.H., Pseudonym, and the defendant did then and there by acts or words threaten to cause or place K.H., Pseudonym, in fear that death or serious bodily injury would be imminently inflicted on K.H., Pseudonym, and said acts or words occurred in the presence of K.H., Pseudonym.

The charge instructed the jury to find appellant guilty if it found beyond a reasonable doubt that appellant intentionally or knowingly penetrated K.H.'s anus with his sexual organ, without her consent and that appellant "did then and there by acts or words threaten to cause or place K.H. . . . in fear that death or serious bodily injury would be imminently inflicted on K.H. . . . and said acts or words occurred in the presence of K.H. . . . ."

The charge also included Count 7, Count 8, and Count 9. Counts 7 and 8 instructed the jury to find appellant guilty of aggravated sexual assault if the jury found beyond a reasonable doubt that the defendant penetrated K.H.'s anus with his sexual organ without her consent and "did then and there by acts or words threaten to cause or place K.H. . . . in fear that death or serious bodily injury would be imminently inflicted on K.H. . . . and said acts or words occurred in the presence of K.H. . . . ." Count 9 instructed the jury to find appellant guilty if it found beyond a reasonable doubt that appellant penetrated K.H.'s mouth with his sexual organ. Be-

cause the State had abandoned these charges, the trial court instructed the jurors to put a cross/"X" over counts 7, 8, and 9, and the judge put her initials next to each cross/"X".

The charge included a general instruction that, to convict, the jury had to unanimously find beyond a reasonable doubt that appellant committed the offense of aggravated sexual assault. The charge did not include a specific instruction that, to convict, the jury had to unanimously agree that appellant committed a particular act of sexual assault. Appellant did not object to this omission.

## C. Applicable Law

■ A jury's verdict must be unanimous regarding the specific crime the defendant committed. TEX. CONST. art. V, § 13; TEX. CODE CRIM. PROC. ANN. art. 36.29(a) (West, Westlaw through 2015 R.S.); *Cosio*, 353 S.W.3d at 771. The jury must "agree upon a single and discrete incident that would constitute the commission of the offense charged." *Cosio*, 353 S.W.3d at page 771. "[N]on-unanimity may occur when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions." *Id.* at 772. And, "[e]ach of the multiple incidents individually establishes a different offense or unit of prosecution." *Id.* Therefore, "[t]he judge's charge, to ensure unanimity, would need to instruct the jury that its verdict must be unanimous as to a single offense or unit of prosecution among those presented." *Id.*

## D. Discussion

■ As neither party has cited any case law directly on point, and we find none, we turn to the law of election in our analysis of whether there is error in this case. Generally, "where one act of intercourse is alleged in the indictment and more than one act of intercourse is shown by the evidence in a sexual assault trial, the State must elect the act upon which it would rely for conviction." *O'Neal v. State*, 746 S.W.2d 769, 771 (Tex. Crim. App. 1988). The Texas Court of Criminal Appeals recognized in *O'Neal*, that in "single count, multiple transaction cases, the State [is] required to elect which transaction (act of intercourse) it would rely upon to prove that single offense," and "[w]here the State fails to elect at the resting of its case in chief, a defendant might find himself without notice as to which of a multitude of acts he might be called upon to defend." *Id.* at 772. However, the Texas Court of Criminal Appeals has also recognized that "[a]n exception to the rule is where several acts of intercourse were committed by one continuous act of force and threats, and are part of the same criminal transaction." *Id.* at 771. In a similar case, the court stated, "It should be borne in mind that the evidence shows several acts of intercourse between [the appellant] and prosecutrix occurring in the same bed on the same night. In such a case, no election is required." *Bethune v. State*, 363 S.W.2d 462, 464 (Tex. Crim. App. 1962). In *Phillips*, the court stated that this exception "applies only where the evidence shows that several acts of intercourse were committed by one continuous act of force and threats that are "part and parcel of the same criminal transaction." *Phillips v. State*, 193 S.W.3d 904, 910 (Tex. Crim. App. 2006) (citing *Steele v. State*, 523 S.W.2d 685 (Tex. Crim. App. 1975)). The court explained that, in a previous case applying the exception, "two acts of intercourse occurred approximately two hours and twenty miles apart" and those acts of intercourse constituted one continuous act of force and threats. *Id.*

■ Here, K.H. testified that appellant put his penis in her anus without her consent, and the SANE testified that she

found an injury on K.H.'s anus. K.H. testified that on the same night in the same bed in a span of approximately five hours, appellant penetrated her anus with his penis at least two times without her consent. K.H. also stated that appellant penetrated her anus on three times that she "could think of." According to K.H., appellant put his penis in her anus without her consent, she became hysterical, appellant removed his penis, and sometime during the encounter appellant put cocaine on her anus and penetrated her anus again with his penis.

K.H.'s testimony supports a finding that appellant's penal penetration of her anus occurred during a continuous act of force or threats. The acts as described by K.H. evidence part of a continuing plan of sexual abuse rather than distinct and separate acts. The acts as described by K.H. occurred in the same place and during an interval of approximately five hours. Therefore, we conclude that the penile penetrations of K.H.'s anus were so closely related that they form part of the same continuous course of conduct toward the same victim. Thus, the trial court did not err in failing to give a unanimity instruction.

Moreover, even assuming that each of these instances of anal penetration by appellant's penis constituted separate offenses, in *Dixon v. State*, the Texas Court of Criminal Appeals in analyzing harm concerning the State's failure to elect in a case where a child testified to multiple instances of sexual assault in the same

manner but on different dates. 201 S.W.3d 731, 735 (Tex. Crim. App. 2006). The *Dixon* court "perceive[d] no risk" of a non-unanimous verdict. *Id.* The court explained that "the only distinguishing detail among the one hundred offenses is that one occurred during the day, while all the others happened at night." *Id.* The court stated that there is "no basis in the record for the jury to believe that one incident occurred during the day but that none occurred at night." *Id.*

Here, K.H. had an injury to her anus, testified that appellant penetrated her anus with his penis without her consent when he turned her over as she was gripping the floor trying to reach for anything. K.H. testified that appellant also put cocaine on her anus and then penetrated her anus once more with his penis without her consent. Here, the only distinguishing detail between the two times K.H. specifically claimed that appellant penetrated her anus without her consent is that the second penetration occurred later than the first.[1] Thus, we cannot conclude that there is any basis in the record for the jury to have believed that one incident of anal penetration occurred with K.H.'s consent and the other did not, especially given that K.H. had an injury to her anus.

Accordingly, we conclude that no error exists under these specific facts. We overrule appellant's first issue.[2]

## II. BRADY MATERIAL

By his second issue, appellant contends that the State did not timely disclose

---

1. Although K.H. testified that appellant put cocaine on her anus the second time, we do not find this fact to be distinguishing because K.H. testified that she had orally ingested cocaine prior to the first anal penetration. Thus, we see no danger that the jury may have found that the cocaine on K.H.'s anus had any effect on her ability to consent to the sexual acts.

2. We note that if the State could prove two separate and distinct crimes, then it would have been correct to charge appellant with multiple acts of anal penetration. However, under these specific facts, K.H.'s testimony supports the State's argument that the evidence showed that the anal penetration occurred during one continuous incident.

*Brady* material. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Specifically, appellant argues that the tape of K.H.'s mother's 911 call was not disclosed until during his trial. Appellant states that "[t]he withheld evidence was favorable to him" and "there is an issue of whether the evidence was material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different." *See id.* However, appellant has not explained what was said in the 911 tape that was favorable to him and he has not explained why it was material and would have changed the outcome of trial. *See* Tex. R. App. P. 38.1(i).

■ Moreover, "[w]hen *Brady* material is disclosed at trial, the defendant's failure either to object to the admission of the evidence on this basis or to request a continuance waives error 'or at least indicates that the delay in receiving the evidence was not truly prejudicial.'" *Perez v. State*, 414 S.W.3d 784, 790 (Tex. App.–Houston [1st Dist.] 2013, no pet.) (quoting *Apolinar v. State*, 106 S.W.3d 407, 421 (Tex. App.–Houston [1st Dist.] 2003), *aff'd on other grounds*, 155 S.W.3d 184 (Tex. Crim. App. 2005); *see Fears v. State*, 479 S.W.3d 315, 327 n.7 (Tex. App.–Corpus Christi 2015, pet. ref'd) (holding that the appellant waived *Brady* error, if any, by failing to request a continuance when the State moved to introduce the complained-of evidence); *Young v. State*, 183 S.W.3d 699, 706 (Tex. App.–Tyler 2005, pet. ref'd) ("The failure to request [a continuance] waives any *Brady* violation, as well as any violation of a discovery order."). Here appellant's trial counsel did not object to the 911 tape on the basis of *Brady* when he

learned of it and no continuance was requested.[3] Therefore, we conclude that appellant did not preserve his *Brady* complaint for our review. *See Perez*, 414 S.W.3d at 790; *see also Fears*, 479 S.W.3d at 327 n.7; *Young*, 183 S.W.3d at 706.

■ In addition, withheld evidence must have been admissible in court before a prosecutor has a duty to disclose it under *Brady*. *Lagrone v. State*, 942 S.W.2d 602, 615 (Tex. Crim. App. 1997) (providing that under *Brady* "the prosecution has no duty to turn over evidence that would be inadmiss[i]ble at trial"); *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) ("A prosecutor does not have a duty to turn over evidence that would be inadmissible at trial."); *see also Ramos v. State*, No. 13-03-00217-CR, 2005 WL 1981550, at *4 (Tex. App.–Corpus Christi Aug. 18, 2005, no pet.) (mem. op., not designated for publication) (concluding that because the alleged *Brady* evidence was inadmissible the prosecution had no duty under *Brady* to turn it over). Here, the 911 was not admitted at trial. And when the trial court stated that it would be inclined to admit the 911 tape, appellant's trial counsel objected on the basis that it constituted inadmissible hearsay. The prosecutor agreed with appellant's trial counsel that the 911 tape was inadmissible and stated that the State would not offer the 911 tape as evidence. Accordingly, because appellant has not argued or shown on appeal that the 911 tape was actually admissible at trial, appellant's trial counsel objected to admission of the 911 tape on the basis that it was inadmissible hearsay, and the trial court did not admit the 911 tape based on appellant's

---

**3.** Appellant states that "the parties noted [to the trial court] that they had an agreement not to introduce the tape into evidence and that defense counsel was 'not gonna argue it.'" And, appellant acknowledges that when

the trial court asked his defense counsel to explain how late notice of the 911 harmed appellant, defense counsel stated that it "affected" his trial strategy.

trial counsel's objection, we overrule appellant's second issue.

### III. Conclusion

We affirm the trial court's judgment.