

# NUMBER 13-23-00379-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JASON EDWARD LARA,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                          Appellee.

## ON APPEAL FROM THE 117TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice Fonseca**

Appellant Jason Edward Lara appeals the trial court's judgment sentencing him to life imprisonment without parole for having committed the offense of capital murder of multiple persons. *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A). He appeals his conviction

on five separate grounds: (1) Krystal Astorga[1] should have been allowed to invoke the spousal privilege and avoid testifying against appellant; (2) it was harmful error to admit certain autopsy photographs; (3) it was harmful error to not strike the testimony of Morse, dismiss the case, or declare a mistrial related to such testimony; (4) the trial court erred in denying appellant's motion for directed verdict, and; (5) appellant had ineffective assistance from trial counsel. We affirm.

## I.    BACKGROUND

The Corpus Christi Police Department (CCPD) arrested appellant on May 18, 2022, for the murders of Erica Larracuente-Aguero and Micaela Sudell. The officers found both victims dead at the Windrush Apartments after they were not heard from for several days. The CCPD determined both were fatally shot.

Appellant was arrested following a CCPD investigation into Micaela's missing vehicle, a Kia Sorento. The Sorento was in the possession of an individual named Ethan Morse. The CCPD arrested Morse, who told them that appellant was someone he was close with, and that appellant had gifted him the Sorento. The CCPD subsequently arrested appellant, who was with Krystal, his wife/girlfriend, at the time of the arrest. During his custodial interview, appellant denied being anywhere near the victims' apartment on May 10, 2022. However, appellant was found in possession of a Walther PK380, the same caliber of handgun used in the victims' murder. Additionally, the CCPD examined appellant's cell phone and used the Google Maps function to determine his phone was at the murder location two different times on May 10, 2022, as well as at Morse's house. The application's tracker function specifically showed appellant in the

<hr>

[1] At trial, Krystal explained that Astorga is her maiden name, but she has also used the surnames Ortiz, Cervantes, and Lara.

victims' apartment as well as at the location where Morse claimed appellant gifted him the Sorento.

Appellant was arraigned on May 20, 2022, and the court appointed Fred Jimenez as his attorney on the same day. Ahead of trial, the State of Texas (the State) disclosed its witness list that included Morse and Krystal, and subpoenaed both, as well as twenty-one other witnesses, to appear at trial. Appellant sent the court a letter in December 2022 asserting that he lived with Krystal and referred to her as his wife. Appellant also filed several motions including a motion for examining trial, a motion for appointment of additional counsel, and multiple motions to suppress evidence, among others. The motions were denied.

Appellant also sought to fire his court-appointed attorney ahead of trial, claiming that Jimenez's representation was deficient due to a lack of communication and failure to properly prepare the case. Jimenez also filed a motion to withdraw as counsel. The trial court denied this motion.

Appellant filed a request for a pretrial hearing outside the presence of the jury to allow the trial court to consider Krystal's request to invoke the spousal privilege. The State responded by filing a motion to grant Krystal immunity for any potential crimes discussed during her testimony, which the trial court granted. At the hearing, Krystal presented herself as Krystal Lara and claimed she was common-law married to appellant. She testified regarding the facts supporting her and appellant's claim that they were common-law married. The State introduced contradicting testimony and evidence, including evidence that Krystal referred to appellant as an "on and off" boyfriend in an interview with the CCPD. Of import, the State introduced evidence that she was still married to her

3

first husband, Rodney Ortiz. Krystal testified that she was divorced from Ortiz, but the trial court took judicial notice of the district clerk's file for Krystal's divorce action with Ortiz that indicated the matter was still pending at the time of trial and that she was not yet legally divorced from him. Accordingly, the trial court denied Krystal's request to claim the spousal privilege.

Trial began on August 15, 2023. Jesse Parmenter, a friend of the victims, testified that because the victims stopped coming to a video game arcade they frequented, he went to the victims' apartment to try to find them and noticed their car was missing. He also testified that he called Micaela multiple times, but she failed to answer. Micaela's mother, Denise Sudell, also testified that she had not heard from Micaela for several days and that she requested for the CCPD to perform a welfare check. She attended the welfare check with an officer on May 14, 2022, and was present when the victims' bodies were discovered.

Officer Chandler Barlow testified regarding the welfare check. He entered the victims' apartment and found a puddle of dry blood at the doorway as well as a swollen discolored female body lying face-up next to the blood. He also noticed a smell and many flies within the apartment. After securing the scene with additional officers, he found a second female body in the back bedroom lying on the bed as well as a spent ammunition casing with her. He also saw a bloody partial footprint outside the apartment doorway and a spent casing outside the apartment down the stairwell. Criminal forensics later arrived and took over the investigation. Denise told him about Micaela's missing vehicle which was later identified as the vehicle recovered from Morse.

Lisa Ramirez, a neighbor of the victims, testified that she spoke with police about

4

her doorbell camera capturing audio from May 10, 2022. The video from her doorbell camera was introduced as evidence, and it showed her stepping outside of her apartment at about 8:00 in the morning. Noise can be heard on the video, which Ramirez identified as gunshots coming from the direction of the victims' apartment.

Claudia Canales, the neighbor below the victims' apartment, testified that her doorbell camera captured video of the stairwell leading up to the victims' apartment. She testified that her camera was spray painted by orange paint around 7:35 AM on May 10, 2022. She also testified she was at home on May 10, 2022, and heard a gunshot. She did not discover the spray paint until several days later after hearing about the victims' death. Upon checking the footage from May 10, she saw that appellant passed in front of her camera. She recognized him by the way he walked because he had some form of a limp. She identified appellant as the one who spray painted her camera. Canales testified that appellant stayed with the victims for about a month or two at one point in time.

CCPD Detective David Perez testified regarding his investigation of the victims' murders as the lead detective. He initially determined appellant was a suspect after speaking with Canales and Ramirez and reviewing their doorbell videos. He also investigated the missing Kia Sorento, which led him to Morse, who told Detective Perez that appellant gifted him the Kia. Based on this information, he obtained an arrest warrant and arrested and interviewed appellant. Detective Perez testified that he believed appellant was dishonest in multiple regards during the interview. Though appellant claimed that he had left the victims' apartment on good terms after staying there, Detective Perez testified that he learned from Krystal that the victims were angry about Krystal cheating on appellant and kicked both Krystal and appellant out of the apartment.

5

Appellant also claimed in the interview that he had not been back to the apartments since he was kicked out, but Detective Perez testified that he determined through the investigation that appellant had in fact been to the location based on cell phone location data, text messages between appellant and Morse, and Morse's testimony.

Detective Perez further testified regarding several of appellant's interview statements that led to him being linked as a suspect. First, appellant said that he had pawned a PlayStation 4 (PS4), which was identified as missing from the victims' apartment and a picture of which was found on appellant's phone. He was seen on video taking the PS4 to a pawn shop. Second, appellant mentioned throwing away his own shoes, preventing Detective Perez from determining whether one matched the bloody footprint outside the victims' apartment. Third, appellant also talked about having a pistol, later identified to be a .380 caliber, the same caliber used to shoot the victims. Detective Perez also testified that he obtained information from Krystal regarding a person that appellant potentially sold his pistol to.

During cross-examination, Detective Perez confirmed there were no direct eyewitnesses to appellant shooting the victims, no DNA or fingerprint evidence linking him to the crime scene, and no text messages indicating that he committed a crime.[2] He said that the only evidence linking appellant's pistol to the one used in the killing was that they were the same caliber. Detective Perez admitted that he didn't know if appellant's pistol even functioned. He also admitted that the CCPD could not measure the shoe size of the bloody imprint. However, Detective Perez summarized that the primary basis for appellant being linked as a suspect was an interview with Krystal where she stated that

---

[2] Detective Perez testified that while Krystal stated that appellant admitted the murders via text message, the CCPD found no text messages on her phone to that effect.

6

he told her he killed the victims, cell phone location data, witness statements that placed appellant at the apartment on the day of the murder, and the doorbell camera videos. The cell phone location data placed appellant at the apartment complex between 7:09 AM and 8:06 AM.

Dr. Ray Fernandez, a former county medical examiner, testified regarding performing the victims' autopsies. He stated the cause of death for Erica was a gunshot wound to the head and for Micaela was multiple gunshot wounds to head, face, and shoulders. State's Exhibit 10 was a color photo of the entry gunshot wound to Erica taken during the autopsy. Appellant's counsel objected to entry of this photo on grounds that it was "gruesome" and "shows nothing of any value," but the trial court denied the objection. Appellant's counsel also objected to State's Exhibits 13 and 14, the autopsy reports themselves, on the grounds that the attached black and white photos were overly gruesome and lacked probative value, but the trial court denied this objection as well.

Morse testified that appellant brought him the Kia Sorento. He said he was close with appellant and called him uncle. On May 11, 2022, appellant brought Morse to an HEB near the Windrush Apartments and then walked across the street to those apartments. Morse and Krystal then drove to Richard Street to meet appellant, where appellant gave him the keys to the Kia. Morse took the car but testified that he later became worried it was stolen and gave it to a third person. Morse later talked to Detective Perez and learned that it was stolen and belonged to the victims. Morse testified that he never visited the victims with appellant, did not know who they were, and that the first time he saw them was in a photo that Detective Perez showed him. He also testified that he was in custody at the Nueces County Jail when he was asked by the State to testify in

the case. Morse testified he was not promised anything in exchange for his testimony. Appellant's trial counsel cross-examined Morse regarding his previous testimony that he sold the Kia in exchange for cocaine; Morse claimed he was lying at the time.

During a break, appellant alleged a *Brady* violation, claiming that the State did not provide a copy of Morse's initial video-recorded interview in police custody. The trial court determined that this video was not provided to the defense prior to trial.[3] The trial court provided appellant's counsel an opportunity to review the video before Morse's testimony concluded. The trial court remarked that it had denied a mistrial, though there was no record of a mistrial request. Eventually, the parties and trial court reached an agreement to resolve this issue by having the trial court instruct the jury that a prior video interview of Morse was not produced to appellant and that in the video the CCPD advised Morse he would not have to worry about a possession charge for talking about appellant's case. The trial court instructed the jury accordingly.

After this instruction, Morse testified that he did not realize at the time that he was offered a deal to talk about appellant's case but admitted that he now understood the CCPD agreed not to pursue a case against him. Appellant's counsel proceeded to cross-examine Morse regarding contradictions in the statements he gave in his first and second interviews, as well as during trial, such as who he traveled with to obtain the Kia Sorento, whether he went to the Windrush Apartments, and whether he went to a game room on Ayers Street. Morse also testified that the police brought him back for a second statement because they had appellant's location data and that it contradicted Morse's previous

---

[3] Additionally, appellant's counsel complained that the State failed to produce an envelope cover for Morse's file with a hand-written note reading "will agree to dismiss possession case." The trial court ruled the handwritten note to be work product that did not need to be produced.

statement.

Haydee Garcia, a latent print examiner for the CCPD, testified regarding her examination of latent fingerprint lifts pulled from the Kia Sorento. Her examination excluded appellant as a source for the lifted prints. She also testified that fingerprints are not found in every case. Kaitlyn Crebo testified regarding DNA she examined from the apartment bathtub, bathroom floor, toilet seat, and multiple locations in the Kia. Appellant was excluded as a contributor for all DNA samples.

Krystal testified that she and appellant stayed at the victims' apartment at one point for around six months. She met the victims through appellant, and they were initially staying to have "fun together." Appellant was also allegedly helping her to stop using drugs. Krystal testified that she and appellant knew multiple people around the apartment complex because appellant sold drugs to most of them. She further testified that she never saw appellant drive the Kia, that the PS4 on his phone belonged to appellant's "nephew," and that appellant's "nephew" asked appellant to sell it for him. She went with appellant to the pawn shop to sell the PS4.

Krystal was examined regarding her recorded statements made to Detective Perez in 2022. She admitted that she told Detective Perez that appellant confessed to her via text message that he shot the victims "for her" due to a problem with the victims. She conceded that that she was crying and upset during the interview, and that she had stated that the reason she came forward was to do the right thing and because she was afraid of appellant. She also admitted that she said appellant physically abused her. Krystal also said that she and Micaela didn't get along because Krystal cheated on appellant. Krystal further admitted that she had fired appellant's pistol before and identified the pistol from

9

a Facebook picture. She also discussed appellant selling the pistol to his friend Gus.

However, Krystal claimed that most of her statement to Detective Perez was a lie and an act. She said that Detective Perez did not ask her to state any of the facts and that she made them up as revenge against appellant because appellant would not let her kill herself. She also claimed she said it because she was in jail and desperate to get back to her children. She said the police gave her enough information to fabricate her story.

Krystal did admit that appellant sold his gun to Gus, though claimed it was a long time before the murders. During cross-examination, she then claimed she never knew whether the gun was sold to Gus and merely talked with appellant about it. She also admitted that appellant told her in August 2022 to state that she never saw appellant at the apartment. Krystal also stated that appellant sold drugs. She testified that she was suffering from mental health issues at the time of the interview and was treating them with prescription and street drugs. Krystal also testified that she retracted the statements in her video interview three to four times in writing.

Carolyn Martinez, a firearms examiner for the CCPD, testified regarding her review of a video depicting appellant with a potential firearm. She testified that the weapon he appeared to be holding was a Walther PK380, a .380 caliber pistol. She also testified that, according to her examination, the casings recovered from the crime scene were fired from a .380 pistol, and the bullets recovered from the victims' bodies were also fired from a .380 pistol. She was able to determine the casings were all fired by the same gun, though she could not make the same conclusion with respect to the bullets.

James Smith, a crime analyst with the CCPD, testified regarding his examination of appellant's cell phone. He examined the Google Maps data to determine a timeline of

places appellant visited. On May 10, 2022, appellant was at the Windrush Apartments from 7:09 to 8:06 AM and from 2:40 to 3:29 PM. Smith further testified that he could pinpoint appellant as being inside the victims' apartment in the morning and inside a different building when he returned in the afternoon. Appellant was also pinpointed on Richard Street early on May 11, 2022, where the alleged handoff of the Kia occurred.

Smith also downloaded photos of a PS4 and a pistol from appellant's phone. He also testified that he determined appellant visited two different pawn shops on May 10, and that police recovered video from one of the pawn shops showing appellant attempting to sell the PS4. On cross-examination, Smith testified that he never recovered any messages from appellant's phone in which appellant admitted to committing any crime. He did find text messages regarding appellant attempting to pawn the PS4.

Appellant testified and admitted he was at the Windrush Apartments on May 10, 2022, but claimed he was only selling drugs to other residents of the apartments. He testified that Krystal was with him that morning. He also claimed to have returned to the apartments later in the afternoon to pick up a PS4 to sell for a friend he called "nephew." Appellant denied being the person on Canales's doorbell camera video. The State cross-examined appellant regarding contradictions between his trial testimony and his initial statements to the CCPD, which he claimed were all lies.

The trial concluded on August 18, 2023, with the jury finding appellant guilty of the crime of capital murder as charged in the indictment. *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A). This appeal followed.

## II. ANALYSIS

Appellant presents five issues on appeal to challenge his conviction. As each issue

11

may be an independent ground sufficient to result in an overturning of appellant's conviction, we will analyze each alleged point of error in turn.

## A. Spousal Privilege

Appellant alleges that it was error for the trial court to allow testimony from Krystal because he was common-law married to her, and she should have been allowed to invoke the spousal privilege.

### 1. Standard of Review and Applicable Law

The spousal privilege is a privilege granted to the spouse of a person that allows the spouse to refuse to disclose confidential communications made to them during a marriage. TEX. R. EVID. 504(a)(2). This privilege allows an accused's spouse to refuse to testify for the state in a criminal case, though this privilege cannot be claimed by the accused himself. *Id.* at 504(b)(1), (3).

The trial court is required to decide preliminary questions regarding privilege and is only bound by the rules regarding privilege when doing so. *Id.* at 104(a). Our review of this decision follows an abuse of discretion standard. *See Porter v. State*, 513 S.W.3d 695, 700 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). We will reverse a trial court "only if 'the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion.'" *Id.* (quoting *Carmona v. State*, 947 S.W.2d 661, 664 (Tex. App.—Austin 1997, no writ)). The burden is on the party asserting the privilege to show the privilege applies. *Id.* There is an abuse of discretion only when the trial court's decision "falls outside the zone of reasonable disagreement." *Lumsden v. State*, 564 S.W.3d 858, 880 (Tex. App.—Fort Worth 2018, pet. denied).

It is undisputed that appellant and Krystal were not ceremonially married. However, the spousal privilege will still apply to a common-law marriage if appellant could prove that he was common-law married to Krystal. *See Freeman v. State*, 230 S.W.3d 392, 402 (Tex. App.—Eastland 2007, pet. denied). Appellant was required to prove that: "(1) [he] and [Krystal] agreed to be married, (2) they lived together after the agreement in Texas as husband and wife, and (3) they represented to others that they were husband and wife." *Id.* (citing *Colburn v. State*, 966 S.W.2d 511, 514 (Tex. Crim. App. 1998)). He had to prove the existence of the marriage via a preponderance of the evidence. *See Welch v. State*, 908 S.W.2d 258, 265 (Tex. App.—El Paso 1995, no writ).

Even so, "[a] marriage is void if entered into when either party has an existing marriage to another person that has not been dissolved by legal action or terminated by the death of the other spouse." TEX. FAM. CODE ANN. § 6.202(a). "When two or more marriages of a person to different spouse are alleged, the most recent marriage is presumed to be valid as against each marriage that precedes the most recent marriage until one who asserts the validity of a prior marriage proves the validity of the prior marriage." *Id.* § 1.102. It is the policy of the state "to preserve and uphold each marriage against claims of invalidity unless a strong reason exists for holding the marriage void or voidable." *Id.* § 1.101. "Once evidence is presented to show the previous marriage was dissolved, then the fact-finder must determine whether the presumption of validity has been overcome," but if sufficient evidence is presented that the prior marriage is ongoing, then subsequent marriages are void. *See In re A.M.*, 418 S.W.3d 830, 842 (Tex. App.—Dallas 2013, no pet.).

13

**2.    Discussion**

The record demonstrates that the trial court took judicial notice of a pending divorce case involving Krystal and her first husband, Ortiz. While appellant asserted that he was common-law married to Krystal and this is her most recent marriage, it is only presumed valid against prior marriages until the prior marriage is proved valid. *See* TEX. FAM. CODE ANN. § 1.102. Due to the trial court taking judicial notice of a then-existing ceremonial marriage to Ortiz, which appellant did not dispute, Krystal's marriage to Ortiz was proven valid. Accordingly, regardless of whether appellant proved the existence of a common-law marriage, any common-law marriage between appellant and Krystal "is void" as Krystal had "an existing marriage to another person that has not been dissolved by legal action." *Id.* § 6.202(a).

Appellant argued that his marriage to Krystal is merely "voidable" because the Family Code provides for an action to declare a marriage void, but the Family Code provides marriages are *void*, not merely voidable, once the existence of a prior marriage is found valid, as was the case here. *Id.* Further, appellant argued without reference to authority that because Krystal cannot claim the spousal privilege as to her prior husband, she must be allowed to do so here. However, the spousal privilege only applies to confidential communications made from one spouse to another during the marriage. TEX. R. EVID. 504(a)(2). Because Krystal was never married to appellant, her inability to claim the spousal privilege as to her prior husband is irrelevant. No matter the status of her prior marriages, she cannot claim the spousal privilege with someone she was never married to. *Id.*

Therefore, we overrule appellant's first issue.

14

**B.     Admission of Autopsy Photographs**

Appellant next challenges the admissibility of certain photographs under Texas Rule of Evidence 403. He claims these photographs were unnecessarily cumulative and thus prejudicial because they depicted the gory wounds of the victims.

**1.     Standard of Review and Applicable Law**

Under Texas law, all relevant evidence is generally admissible. *See* TEX. R. EVID. 402. However, the trial court may exclude even relevant evidence if its probative value is substantially outweighed by danger of unfair prejudice or if it is needlessly presenting cumulative evidence. *Id.* at 403. We review a trial court's decision on whether to admit photographs using an abuse of discretion standard. *See Rodriguez v. State*, 398 S.W.3d 246, 253 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.). We therefore "should 'do more than decide whether the trial judge did in fact conduct the required balancing between probative and prejudicial parties; the trial court's determination must be reasonable in view of all relevant facts.'" *Id.* (quoting *Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006)).

We use a balancing test to determine whether prejudice outweighs the probative value by evaluating the following non-exclusive factors:

- how probative the evidence is;

- the potential of the evidence to impress the jury in some irrational but

15

indelible way;

- the time needed to develop the evidence; and

- the proponent's need for the evidence.

*Id.* For photos, these factors have been developed to include the following considerations:

> the number of photographs, the size of the photograph, whether it is in color or black and white, the detail shown in the photograph, whether the photograph is gruesome, whether the body is naked or clothed, and whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellant's detriment.

*Id.* (citing *Shuffield*, 189 S.W.3d at 787).

"Generally, photographs are admissible if verbal testimony about the matters depicted in the photographs would be admissible and their probative value is not substantially outweighed by any of the Rule 403 counter-factors." *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004). Further, autopsy photos particularly are generally admissible unless they depict "mutilation of the victim caused by the autopsy itself." *Pugh v. State*, 639 S.W.3d 72, 87 (Tex. Crim. App. 2022) (citing *Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998)). Being gruesome alone does not require exclusion. *Reese v. State*, 340 S.W.3d 838, 841 (Tex. App.—San Antonio 2011, no pet.). Such photos are generally relevant to show the manner and means of death. *See Williams v. State*, 937 S.W.2d 479, 487 (Tex. Crim. App. 1996); *see also Smart v. State*, No. 03-22-00068-CR, 2024 WL 647646, at *9 (Tex. App.—Austin Feb. 16, 2024, no pet.) (mem. op., not designated for publication).

16

### 2.     Discussion

Appellant contends the trial court erred in admitting "multiple black & white photos of the deceased victims" that were attached to the medical examiner reports for both victims. However, the exact exhibits appellant complains of are unclear because, appellant also contends that the color photos in State's Exhibits 10–12 were all "highly prejudicial" and inadmissible. Based on our review of the record, the only exhibits appellant objected to at trial were Exhibits 10, 13, and 14, and, therefore, error is only preserved as to those exhibits. *See* TEX. R. APP. P. 33.1. We will thus limit our analysis to those exhibits.

Appellant argues that the jury could have determined the cause of death from the "autopsy" photos contained in "the report" alone and did not need the black and white photos. The unclear nature of appellant's complaints aside, our examination of these photos reveals that there are numerous photos that show gruesome details of the wounds and depict the victims both clothed and naked. *See Rodriguez*, 398 S.W.3d at 253. However, autopsy photos merely being gruesome does not alone warrant exclusion. *Reese*, 340 S.W.3d at 841. These photos depict the nature of the victims' wounds, including bullet entries into their bodies, the cause of death, and resulting damage. *See Williams*, 937 S.W.2d at 487. Autopsy photos are relevant and admissible for these purposes. *Pugh*, 639 S.W.3d at 87.

An autopsy photo may be inadmissible if it depicts mutilation caused by the autopsy itself. *Id.* Appellant asserted that the photo in Exhibit 10 showed mutilation caused by the autopsy itself. This exhibit is a gory color photo of the bullet wound in Erica's head obtained by removing a portion of her scalp during the autopsy. However, a

17

photo showing mutilation caused by an autopsy can still be admissible if it focuses directly on the wounds caused by the killing rather than the wounds caused by the autopsy. *See id.* Based on our review of the record, we cannot conclude that the trial court abused its discretion in admitting this photo. The photo focuses primarily on the bullet wound and as supported by Dr. Fernandez's testimony, the purpose of the photo is to demonstrate Erica's cause of death. Photos are admissible if verbal testimony about the matters depicted in the photograph is admissible and it is not disputed that Dr. Fernandez's testimony on the same subject matter was admissible. *See Rodriguez*, 398 S.W.3d at 254 (quoting *Threadgill*, 146 S.W.3d at 671). Therefore, the trial court's admission of this photo is "reasonable in view of all relevant facts." *See id.* at 253.

Appellant does not assert exhibits 13 and 14 depict wounds caused by the autopsy, however, examination of these photos does indicate that several photos depict removal of the victims' scalps and gory depictions of the victims' brains. The number and gruesomeness of the photos attached to Exhibits 13 and 14 weighs towards the photos being prejudicial while the fact that the photos are black and white and have probative value weighs in favor of their admission. As there are at least seventeen photos in Exhibits 13 and 14 focused more on the removed scalp than the bullet wound, and the cause of death is not disputed by the parties, we find that the trial court abused its discretion in admitting these photos as the prejudicial nature of the photos outweighs any probative value the photos have. *See id.*

However, though the trial court erred in admitting these photos, appellant failed to demonstrate any harmful error because of the erroneous admission. Erroneous admission of photographs is harmless error if in review of the entire record, we determine

18

"the error did not influence the jury or had but a slight effect upon the jury's verdict." *Rolle v. State*, 367 S.W.3d 746, 752 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). As detailed below in discussion of appellant's fourth issue, there is plenty of evidence supporting appellant's conviction. Whatever prejudicial effect the gory photos of the victims' autopsy wounds might have had on the jury, it is so slight as it would not have had sway unless the jury determined appellant was the party responsible for the victims' deaths. *Id.* at 756. Appellant points to no record support demonstrating that admission of the photos had an outsized influence on the jury's determination of guilt. As such, we overrule appellant's second issue.

## C.     Testimony of Ethan Morse

Appellant's third point of error alleges that the trial court erred in admitting the testimony of Morse and failing to dismiss the case or declare a mistrial. Appellant claims that Morse falsely testified that he did not receive a plea deal for his testimony and further asserts that the State failed to disclose the existence of this agreement in violation of *Brady v. Maryland*. *See generally Pena v. State*, 353 S.W.3d 797 (Tex. Crim. App. 2011).

### 1.     Standard of Review and Applicable Law

Texas law requires via *Brady* that the prosecution in a criminal case must disclose evidence favorable to an accused if it is material to guilt or punishment regardless of whether a defendant requests it. *Id.* at 809 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)); *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (holding that a defendant does not need to request *Brady* materials). Further, the Texas Code of Criminal Procedure also requires disclosure of all written or recorded statements of a witness after a timely request by the defendant. TEX. CODE CRIM. PROC. ANN. 39.14(a).

To establish reversible error under this standard,

a defendant must show that

(1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith;

(2) the withheld evidence is favorable to him;

(3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.

*Pena*, 353 S.W.3d at 809. Favorable evidence is evidence that "may make the difference between conviction and acquittal." *Harm*, 183 S.W.3d at 406. Evidence is material only when there is a reasonable probability that if the evidence had been disclosed it would have led to a different result. *See Fears v. State*, 479 S.W.3d 315, 327 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd). "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Id.* The defendant must be prejudiced by the failure to disclose. *Id.*

If disclosure of material occurs mid-trial, then we examine whether the disclosure came in time to make effective use of it at trial. *Id.* "If the defendant received the material in time to use it effectively at trial, his conviction should not be reversed just because it was not disclosed as early as it might have and should have been." *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

Generally, in order to preserve a complaint for appellate review, an appellant must demonstrate a timely request, or motion was made to the trial court that the trial court either ruled on or refused to rule on. TEX. R. APP. P. 33.1(a)(1)–(2). To preserve an alleged *Brady* violation in particular, the defendant must object to the admission of the evidence on that basis or request a continuance. *Rubio v. State*, 534 S.W.3d 20, 27 (Tex. App.—

20

Corpus Christi–Edinburg 2017, pet. denied). The failure to request a continuance waives any error resulting from a *Brady* violation. *Id.*; *State v. DeLeon*, 971 S.W.2d 701, 706 (Tex. App.—Amarillo 1998, pet. ref'd); *see also Garza v. State*, No. 13-22-00599-CR, 2024 WL 4986401, at *8 (Tex. App.—Corpus Christi–Edinburg Dec. 5, 2024, pet. denied) (mem. op., not designated for publication).

## 2. Discussion

Appellant contends that it was error for the trial court to not dismiss the case or declare a mistrial following the revelation of the State's *Brady* violation. However, the record does not indicate that appellant ever requested a mistrial or for the trial court to dismiss the case against him.[4] Regardless of the merits of this request, appellant's failure to preserve error by seeking a mistrial or dismissal in the trial court related to this issue waives these points for our review. *See id.*

Further, the complained-of evidence was a single video interview with Morse that was disclosed mid-trial. The record reflects that the State failed to disclose this video prior to trial and that the video was favorable to appellant. *See Pena*, 353 S.W.3d at 809; *see also* TEX. CODE CRIM. PROC. ANN. 39.14(a). However, because it was disclosed during trial, appellant's conviction can only be overturned if he was not able to use it effectively at trial, if he requested a continuance which was denied, or if he objected to admission of the evidence. *See Little*, 991 S.W.2d at 866; *see also Rubio*, 534 S.W.3d at 27; *Fears*, 479 S.W.3d at 327.

The record reflects that appellant neither requested a continuance after learning of the potential *Brady* violation nor objected to admission of the evidence. Instead, the

---

[4] The record indicates the trial court made a statement regarding denying a mistrial, but the record does not show any request from either party for a mistrial.

21

parties and trial court held a conference outside the presence of the jury, eventually agreeing that appellant's counsel would be given time to review the video and prepare adequate cross-examination, and that the jury would be instructed regarding the State's failure to disclose the video pre-trial. The record demonstrates that the jury was instructed accordingly, and that appellant's counsel was able to cross-examine Morse regarding the contents of the video that was not timely disclosed.

Moreover, appellant cannot demonstrate that he suffered any harm due to the State's late disclosure. It is undisputed that his counsel was able to make full use of the video's contents at trial. *See Little*, 991 S.W.2d at 866. Appellant failed to show how the trial's outcome would have been different due to an earlier disclosure. *See Pena*, 353 S.W.3d at 809; *see also* TEX. R. APP. P. 44.2.

"[Appellant's] conviction should not be reversed just because [the video] was not disclosed as early as it might have and should have been." *Id.* Accordingly, we overrule appellant's third issue.

## D.        Motion for Directed Verdict

Fourth, appellant contends the trial court erred by failing to grant his request for a directed verdict. Appellant contends the evidence at trial was insufficient to prove that he perpetuated the crime.

### 1.        Standard of Review and Applicable Law

"A challenge on appeal to the denial of a motion for directed verdict is a challenge to the legal sufficiency of the evidence and is reviewed under the same standard." *Wharton v. State*, 711 S.W.3d 92, 101 (Tex. App.—Houston [1st Dist.] 2024, pet. filed). Each essential element of a criminal offense must be supported by legally sufficient

22

evidence that the State proved beyond a reasonable doubt. *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). We determine the essential elements by examining the hypothetically correct jury charge, which should:

(1) accurately set out the law;

(2) be authorized by the indictment;

(3) not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability; and

(4) adequately describes the particular offense for which defendant was tried.

*Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). "This list is 'not necessarily exhaustive.'" *Id*. (quoting *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000))."To determine whether this standard has been met, we review all the evidence in the light most favorable to the verdict and decide whether a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt." *Wharton*, 711 S.W.3d at 101–02. This includes both properly and improperly admitted evidence. *Id*. We defer to the factfinder's resolutions of conflicting evidence including the credibility and weight they assign to it. *Id*. "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination." *Dunham*, 666 S.W.3d at 482.

"Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Further, circumstantial evidence is equally probative as direct evidence, and circumstantial evidence alone is "sufficient to establish guilt." *Id*. We treat direct evidence

23

and circumstantial evidence equally on appellate review. *Dunham*, 666 S.W.3d at 482 (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

### 2. Discussion

Appellant moved for a directed verdict at trial claiming there was insufficient evidence to support a conviction due to, among other things, the lack of fingerprints or DNA evidence linking him to the crime scene, the lack of eyewitnesses to the crime, and the lack of a murder weapon. The State responded by stating sufficient circumstantial evidence existed, and the trial court denied the motion. Appellant complains on appeal that the motion should have been granted as all evidence supporting conviction was circumstantial evidence and that there was no direct evidence linking him to the crime. He further contends the jury could not find the statements from Krystal credible due to their inconsistency and that Dr. Fernandez's testimony was the only direct evidence regarding the cause of death.

However, appellant concedes that there is a "substantial" amount of circumstantial evidence supporting his conviction. Under Texas law, circumstantial evidence is equally probative as direct evidence, and circumstantial evidence alone can establish guilt. *Hooper*, 214 S.W.3d at 13. Reviewing the evidence in the light most favorable to the verdict, we agree that there is substantial circumstantial evidence such that a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *See Wharton*, 711 S.W.3d at 101-02.

Appellant is correct that there was no DNA or fingerprint evidence tying him to the crime scene, nor was there a recovered murder weapon or any eyewitnesses to the shooting. However, there is plenty of other evidence that supports the jury's determination

that appellant committed the crime. The jury heard testimony from apartment residents regarding audible gunshots on the morning of May 10, 2022, and that appellant was visible on their doorbell cameras that same morning. Testimonial and physical evidence also placed appellant at the property on that morning, including appellant's cell phone location data. Finally, Krystal stated that appellant confessed to the crime via text message. While she later contradicted herself, it is the jury's job to make credibility determinations, and we must presume that the jury resolved conflicts in the evidence in favor of the verdict. *See Dunham*, 666 S.W.3d at 482. Krystal's testimony is not disregarded due to these contradictions, as appellant contends. *See Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) ("[W]hen a witness recants prior testimony, it is up to the fact finder to determine whether to believe the original statement or the recantation.").

Other evidence supporting the jury's findings included Morse's testimony that he obtained the victims' Kia from appellant, appellant's attempt to sell a PS4 that allegedly belonged to the victims, evidence that appellant owned a pistol with the same caliber as the one used to kill the victims, and Dr. Fernandez's testimony that the victims died of gunshot wounds. While there are potential conflicting inferences and facts regarding when appellant's pistol was sold, how the Kia wound up in Morse's possession, and who the true owner of the PS4 was, these are all conflicting inferences that are in the jury's province to resolve. The jury was free to believe the evidence supporting appellant's conviction and disbelieve conflicting evidence. *See id.*

Appellant himself testified as to his alternate explanation for where he was located on May 10, 2022, and the circumstances surrounding the PS4, and the jury was free to

25

consider his testimony as dishonest. We must defer to the factfinder's resolution of these conflicting inferences. *Id*. If the cumulative force of all of the incriminating circumstances is sufficient to support conviction, as here, we must not disturb the jury's findings. *See Hooper*, 214 S.W.3d at 13.

Thus, we overrule appellant's fourth issue.

**E.     Ineffective Assistance of Trial Counsel**

Finally, appellant contends that he received ineffective assistance from his trial counsel. He claims that such failures were prejudicial to his defense and that he would not have been found guilty otherwise.

**1.     Standard of Review and Applicable Law**

We review the adequacy of representation at trial using the standard from *Strickland v. Washington*, which requires appellant to show (1) that his counsel's performance was deficient and (2) that he suffered prejudice as a result. *See Tanner v. State*, 707 S.W.3d 371, 376 (Tex. Crim. App. 2024) (citing 466 U.S. 668, 694 (1984)). "The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence." *Perez v. State*, 689 S.W.3d 369, 381 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.). Failure to prove either prong defeats the ineffectiveness claim. *Tanner*, 707 S.W.3d at 376. "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996). Thus, claims of ineffective counsel are usually not successful on direct appeal as the record is typically inadequately developed and does not adequately reflect the trial counsel's

26

failings enough for us to fairly evaluate the merits of this allegation. *See Tanner*, 707 S.W.3d at 377.

To show a performance was deficient, appellant must prove that his counsel's actions "fell 'below the professional norm of reasonableness.'" *Id*. at 376 (quoting *McFarland*, 928 S.W.2d at 500). In our review, we look at the totality of the representation and each case's circumstances and follow a strong presumption that the conduct fell within the wide range of reasonable professional assistance. *Id*. "A reviewing court will not second-guess legitimate tactical decisions made by trial counsel." *Lopez v. State*, 672 S.W.3d 915, 927 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd). The errors must be so serious that the counsel was essentially not functioning as the "counsel" guaranteed by the Sixth Amendment. *Perez*, 689 S.W.3d at 381 (internal citations omitted). The right to effective assistance of counsel does not guarantee errorless or perfect representation. *Hartwell v. State*, 476 S.W.3d 523, 532 (Tex. App.—Corpus Christi–Edinburg 2015, pet. denied). To warrant reversal when trial counsel has not been afforded an opportunity to explain his reasons, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'" *Roberts v. State*, 220 S.W.3d 521, 533–34 (Tex. Crim. App. 2007).

Meanwhile, to show prejudice, appellant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lopez*, 672 S.W.3d at 928. We must consider if the jury would have had reasonable doubt regarding guilt absent counsel's error and evaluate the totality of the evidence in doing so. *Id.* "Some errors might be trivial in comparison to the facts, and

other errors might have a pervasive effect." *Id.* Conclusory assertions on their own do not demonstrate prejudice. *Ex parte Parra*, 420 S.W.3d 821, 828 (Tex. Crim. App. 2013).

### 2.    Discussion

Appellant argues that his trial counsel was ineffective for several reasons. First, he claims that his counsel failed to effectively research the case and generally failed to prepare the witnesses for testifying at trial, though provides no specific examples for either of these arguments. He also claims that his counsel was "surprised" and "ineffective" during his cross-examination of the State's witnesses and presentation of the defense. The only citation to the record he offers for this point is to his counsel stating he didn't have an opportunity to speak to Krystal regarding enforcement of "the rule [of witness sequestration]." Appellant also faults his counsel for failing to object to the State's motion in limine, and for not objecting to the production of certain exhibits without proper foundation. He also argues generally that "critical evidence of the victims and witnesses were not admitted" but does not specify what evidence and which witnesses were not admitted that caused him to suffer prejudice.

Based on the foregoing, appellant failed to meet his burden to show deficient performance by a preponderance of the evidence. *Perez*, 689 S.W.3d at 381. Because there were no post-trial motions nor any other opportunity for appellant's trial counsel to explain himself, his conduct will be considered deficient only if it is so outrageous that no competent attorney would have engaged in it. *Roberts*, 220 S.W.3d at 533–534. Appellant did not assert any conduct that reaches that outrageous level or that otherwise falls below the professional norm of reasonableness. *See id.*; *Tanner*, 707 S.W.3d at 377.

His broad assertions that his counsel did not properly research the case or prepare witnesses are entirely conclusory and without record support. *See McFarland*, 928 S.W.2d at 500. Appellant does not specify any witness whose "lacking" testimony led to harm against him, nor does he point to any area of research that would have led to a different result. *See Lopez*, 672 S.W.3d at 928. These vagaries are the opposite of allegations "firmly founded in the record" which are needed to demonstrate ineffective assistance of counsel. *See McFarland*, 928 S.W.2d at 500.

Appellant also argues his counsel erred by allowing certain pieces of evidence to enter the record and by not objecting to the motion in limine, but he fails to point to any specific harm caused by admission of this evidence that would have probably caused a different result. *See Lopez*, 672 S.W.3d at 928. There is no record support that the failure to object to the State's motion in limine would have caused the jury to have reasonable doubt as to defendant's guilt, and indeed the only citation to the record on this point does not demonstrate that the trial court sustained an objection related to the motion in limine as appellant claims. *See id.* Because appellant has failed to affirmatively show in the record any basis for ineffective assistance of counsel, we overrule his fifth issue.

### III. CONCLUSION

We affirm the trial court's judgment.

YSMAEL D. FONSECA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
17th day of July, 2025.